203 P.3d 471 (2009)
Phyllis SWETZOF, in her capacity as Clerk of the City of St. Paul, Alaska, and the City of St. Paul, Alaska, Appellants,
v.
Anthony PHILEMONOFF and Nicolai Melovidov, Appellees.
No. S-13165.
Supreme Court of Alaska.
February 13, 2009.
Rehearing Granted March 31, 2009.
*472 Ronald L. Baird, Office of Ronald L. Baird, Anchorage, for Appellants.
Elisabeth H. Ross, Thomas F. Klinkner, Birch, Horton, Bittner & Cherot, Anchorage, for Appellees.
Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

OPINION
MATTHEWS, Justice.
This opinion deals with the second of two proposed initiatives designed to force the City of St. Paul out of the business of selling electric power.[1] In an earlier order we held that the first proposal did not meet "the enforceable as a matter of law" requirement of AS 29.26.110(a)(4)[2] and authorized the city clerk to remove it from the ballot for the October 2008 election.[3] The second proposed initiative is challenged on the same basis, as well as on the ground that it does not "relate[ ] to a legislative rather than an administrative matter," as required by AS 29.26.110(a)(3).
*473 To set the context of this case we quote from our earlier order:
At issue in this case are decisions by Phyllis Swetzof, Clerk of the City of St. Paul, refusing to certify two proposed initiatives. The first proposal (Application I) stated:
The qualified voters of the City of Saint Paul who have signed the attached pages of this application for petition hereby request that the following measure be submitted to the qualified voters of the City of Saint Paul pursuant to Alaska Statute § 29.26.100.
AN ORDINANCE OF THE PEOPLE OF THE CITY OF SAINT PAUL PROVIDING THAT THE CITY OF SAINT PAUL SHALL NOT ENGAGE IN THE SALE OR DELIVERY OF ELECTRIC POWER TO RETAIL CUSTOMERS AND REQUIRING THE CITY TO ACTIVELY PROMOTE RENEWABLE ENERGY
BE IT ORDAINED BY THE PEOPLE OF THE CITY OF SAINT PAUL:
 Section 1. The City of Saint Paul shall not engage in the sale or delivery of electric power to retail customers and shall actively support renewable energy for sale to retail customers.
 Section 2. This ordinance shall take effect 120 days after certification of the election.
Swetzof refused to certify this proposal finding, among other reasons, that it did not meet the "enforceable as a matter of law" requirement of AS 29.26.110(a)(4) because the City could not discontinue retail electric service without applying for and obtaining the approval of the Regulatory Commission of Alaska (RCA).
The second proposal (Application II) was submitted in response to Swetzof's rejection of the first. It provided:
The qualified voters of the City of Saint Paul who have signed the attached pages of this application for petition hereby request that the following measure be submitted to the qualified voters of the City of Saint Paul pursuant to Alaska Statute § 29.26.100.
AN ORDINANCE OF THE PEOPLE OF THE CITY OF SAINT PAUL PROVIDING THAT THE CITY OF SAINT PAUL SHALL NOT ENGAGE IN THE SALE OR DELIVERY OF ELECTRIC POWER TO RETAIL CUSTOMERS.
BE IT ORDAINED BY THE PEOPLE OF THE CITY OF SAINT PAUL:
 Section 1. The City of Saint Paul shall not engage in the sale or delivery of electric power to retail customers.
 Section 2. This ordinance shall take effect 120 days after certification of the election and shall provide that the City [of] St. Paul shall take all necessary steps including obtaining regulatory approval to discontinue electric utility service.
 Section 3. This ordinance is subject to the Regulatory Commission of Alaska's approval of the City of Saint Paul's discontinuance of electric utility service.
When Swetzof refused to certify this proposal, the sponsors of both proposals, Anthony Philemonoff and Nicolai Melovidov, filed suit in the superior court challenging her rulings. The superior court found that Swetzof had erred and ordered her to certify both applications. Swetzof has appealed this ruling. An election will be held in the City of Saint Paul on October 7, 2008. At oral argument, counsel notified this court that, for reasons unrelated to this dispute, Application I but not Application II will be on the ballot.1 Swetzof requested an expedited hearing on appeal and this court has granted her request.
1. But whether Swetzof properly refused to certify Application II remains as an issue in this case.[4]
We ruled that the first proposal (Application I) was not enforceable as a matter of law because  assuming the initiative passed  the City could not simply stop selling electric *474 power within 120 days after the vote. We pointed out that the City, as a public utility, would have to seek permission to sell the utility or discontinue service from the Regulatory Commission of Alaska (RCA), that proceedings before the commission could be lengthy, and that the outcome of such proceedings would be uncertain:
Having considered the parties' briefs and argument, the court concludes that Swetzof correctly refused to certify Application I. Application I would not be enforceable as a matter of law because the City of Saint Paul could not simply stop selling or delivering electrical power to retail customers within 120 days after certification of the election. Instead, permission to discontinue or abandon electric service or to sell the utility to another entity would have to be sought and obtained from the RCA. Proceedings conducted by the RCA require notice to and an opportunity to be heard for interested persons. The proceedings may be complex, expensive, and time consuming, and their outcome is uncertain.[[5]]
We rejected the superior court's conclusion that Application I should be viewed as impliedly subject to a condition that the City could only cease operating its electric utility upon receiving the RCA's approval. We found such an implication unwarranted by the proposal's language and potentially misleading to voters:
The superior court held that Application I should be considered to be "subject to the implicit condition that the RCA will approve the City's application, either to cease retail electric utility service or transfer its certificate." But given the mandatory and time-limited language of Application I, the nature of the proceedings that must take place before the RCA, and the uncertainty of the ultimate result, we believe that the judicial imposition of an implicit condition of RCA approval is both unjustified and potentially misleading to the electorate.2
2. The superior court relied on a 1965 decision from an intermediate appellate court in California, Hughes v. City of Lincoln, 232 Cal. App.2d 741, 43 Cal.Rptr. 306 (Cal.App.1965), as justification for its conclusion that the proposal was implicitly subject to needed approval by the RCA. In Hughes the petition sought the cessation of fluoridation by the city's water utility. This could only be accomplished if the state board of public health issued an amended permit. The court in Hughes held that permission from the state board should be considered an implicit condition of the proposed ordinance. But in so ruling the court suggested that state board approval of defluoridation would be routine since the state board was only concerned with water purity and potability, not dental health: "If the board finds that cessation of fluoride treatment will not make the water impure, unpotable or dangerous, it must permit cessation. This scheme of statutory regulation does not express any state policy, one way or the other, on fluoridation as a therapeutic measure." Id. at 748, 43 Cal.Rptr. 306. Hughes is distinguishable based on the expected routine nature of the needed administrative approval there, in contrast to the complex and uncertain administrative approval required in this case.[6]
Our order only dealt with Application I because it was on the October ballot and the second proposal (Application II) was not. We noted that an opinion would follow with respect to Application II.[7]
Application II is challenged on two grounds. First, the City contends that, if adopted, it would not be enforceable as a matter of law and therefore violates AS 29.26.110(a)(4). Second, the City contends that Application II does not relate to a legislative, as distinct from an administrative, matter and therefore violates AS 29.26.110(a)(3).
Before addressing these arguments two observations are in order. First, we "construe voter initiatives broadly so as to preserve them whenever possible."[8] Thus we narrowly interpret the subject matter limitations placed on initiatives by the Alaska *475 Constitution and statutes.[9] Nonetheless, courts have a duty to give careful consideration to questions involving whether a constitutional or statutory limitation prohibits a particular initiative proposal on subject matter grounds.[10]
Second, because this case involves questions of whether the proposed initiative complies with the statute regulating initiatives, it is appropriately decided before the proposed initiative is voted on by the electorate:
Pre-election review of challenges to ballot initiatives is limited to ascertaining "whether [the initiative] complies with the particular constitutional and statutory provisions regulating initiatives."[[11]]
Other claims of unlawfulness are justiciable only after the initiative is enacted. Thus our review at this stage is limited to compliance with AS 29.26.110(a).

APPLICATION II WOULD BE ENFORCEABLE AS A MATTER OF LAW.
As noted, we held that Application I would not be enforceable as a matter of law because, contrary to the language of the proposed initiative, the City could not under state law simply stop operating as an electrical utility 120 days after the initiative passed.[12] We concluded that it would be inappropriate to read into the proposal an implied condition that the proposal would only be effective upon the RCA's approval of the City's cessation of service.[13] Such an implication would be uncalled for, we concluded, because the proposal's language did not suggest it, the likelihood of RCA approval was uncertain, the process of undertaking to obtain RCA approval would be time consuming and expensive, and the proposal would likely mislead voters, who would not be aware of the judicially implied condition.[14]
In Application II, the condition of RCA approval is express. It therefore does not suffer from the same deficiency as Application I. But the City contends that because the RCA may never approve discontinuance of service by the City, the proposal is merely aspirational and would not be enforceable as a matter of law. In support of this point the City cites footnote 21 of Kodiak Island Borough v. Mahoney, where we observed that
[b]ecause the language of AS 29.26.110(a)(4) requires the rejection of initiative petitions that would be unenforceable as a matter of law, we also believe that a clerk must reject an initiative that proposes an ordinance which is merely aspirational or which otherwise lacks the attributes of an enforceable law. For example, the proposal must be comprehensible and concrete enough to be capable of enforcement.[[15]]
Yute Air Alaska, Inc. v. McAlpine[16] answers the question of whether Application II is sufficiently concrete as to be capable of enforcement. The initiative proposal there, in part, required the governor to use his best efforts to seek the repeal of the federal Jones Act  which requires shipments between domestic ports to be made on United States ships.[17] The governor was also required to report annually on progress toward that end and on the harmful effects of the Jones Act on Alaska commerce.[18] The initiative's opponents *476 argued that the part of the proposal addressing the Jones Act, even if passed, would not be a "law," but merely an aspirational resolution.[19] The premise of this argument was that the constitutional power of initiative is limited to the proposal and enactment of "laws."[20] We held in Yute Air that because the proposal mandated action by the governor, it was a law rather than merely an aspirational resolution.[21]
Like the proposal in Yute Air, Application II mandates action. It requires the City to "take all necessary steps including obtaining regulatory approval to discontinue electric utility service." While the steps mandated by the proposal might ultimately not succeed, the requirement that they be taken is as binding on the City as the "best efforts" requirement in Yute Air. We conclude therefore that Application II satisfies the "enforceable as a matter of law" requirement.

APPLICATION II RELATES TO A LEGISLATIVE RATHER THAN AN ADMINISTRATIVE MATTER.
In most jurisdictions municipal initiative and referendum powers are restricted to enactments that are legislative rather than administrative or executive in character. Often this is a common law restriction, and this court recognized it as such in 1973 in Wolf v. Alaska State Housing Authority.[22] In 1985 a general revision of the Alaska Municipal Code was passed.[23] This revision added AS 29.26.110, which in part (a)(3) codifies the legislative-enactment restriction on municipal initiatives.[24] This court has not had occasion to interpret this provision.
The rationale for the rule that provides that only legislative enactments can be enacted by municipal initiatives is based on government efficiency grounds. For instance, one court has explained:
A charter giving a small group of electors the right to demand a vote of the people upon every administrative act of the city council would place municipal government in a straight-jacket and make it impossible for the city's officers to carry on the public business.[[25]]
Likewise, another court has stated:
While a proposed initiative, unlike a referendum, does not immediately suspend an act of the Council until such time as the voters have passed on it ... it does effectively leave the execution and administration of a given legislative policy in doubt pending the outcome of the vote. Therefore, the same rationale that serves to bar administrative and executive actions from being subject to the referendum also has been applied to bar them from being subject to the initiative: an initiative on executive action would seriously encumber, if not paralyze, the execution of a previously-approved policy or program, without ever actually addressing the merits of the program itself.[26]
A leading text, Antieau on Local Government Law, skeptically states that "[t]here is no satisfactory test for determining when an ordinance is `legislative' nor is there uniform application of the rule."[27] Antieau describes the usual formulation for making the required distinction as follows:
Courts applying the rule usually say that legislation is "legislative" if it makes a new law, whereas it is "administrative" if it only provides for the execution of an old law. The Kentucky Court is typical of the majority view when it states that the rule "for determining whether a particular matter is *477 legislative or administrative, is that if the power to be exercised prescribes a new policy or plan it is legislative, whereas if it merely pursues a plan already adopted by the legislative body or some power superior thereto it is administrative." It is also said to be legislative when it is permanent and general, and administrative when it is temporary, routine or detailed.[28]
A summary offered by the other leading municipal law text, McQuillin's Law of Municipal Corporations, is similar:
Actions relating to subjects of a permanent and general character are usually regarded as legislative, and those providing for subjects of a temporary and special character are regarded as administrative.... The test of what is a legislative and what is an administrative proposition, with respect to the initiative or referendum, has further been said to be whether the proposition is one to make new law or to execute law already in existence. The power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it. Similarly, an act or resolution constituting a declaration of public purpose and making provision for ways and means of its accomplishment is generally legislative as distinguished from an act or resolution which merely carries out the policy or purpose already declared by the legislative body.[[29]]
The City suggests that we should use the guidelines employed by the Supreme Court of Kansas in City of Wichita v. Kansas Taxpayers Network, Inc.[30] The guidelines are:
1. An ordinance that makes new law is legislative; while an ordinance that executes an existing law is administrative. Permanency and generality are key features of a legislative ordinance.
2. Acts that declare public purpose and provide ways and means to accomplish that purpose generally may be classified as legislative. Acts that deal with a small segment of an overall policy question generally are administrative.
3. Decisions which require specialized training and experience in municipal government and intimate knowledge of the fiscal and other affairs of a city in order to make a rational choice may properly be characterized as administrative, even though they may also be said to involve the establishment of a policy.
4. No one act of a governing body is likely to be solely administrative or legislative, and the operation of the initiative and referendum statute is restricted to measures which are quite clearly and fully legislative and not principally executive or administrative.[[31]]
The courts of at least two other states, Montana and New Mexico, have used these guidelines.[32]
Adverting to the Kansas Taxpayers guidelines, the City argues that Application II is primarily administrative in character for two reasons. First, according to the City, a rational decision to discontinue the electric utility involves technical expertise that is beyond the electorate's knowledge. The City argues that the third guideline pertaining to the requirement of specialized training and knowledge applies and therefore the proposal is beyond the initiative power. Second, the City argues that the requirement in Application II that the City take all necessary steps to obtain regulatory approval to discontinue utility service requires prosecution of an administrative proceeding. The City argues that the third guideline is implicated here because administrative litigation should not be undertaken without expert advice as to *478 the cost of proceeding and the chances of success. The City argues:
Absurdly, the second proposed ordinance, with its command to "take all necessary steps," would require the City to blindly soldier forward in the regulatory proceedings regardless of cost and regardless [of] the probability of success. In the event of an adverse ruling by the commission, the City presumably must prosecute an appeal through the courts of the state.
The City also argues that the commencement and prosecution of litigation is inherently administrative in nature, and this provides another reason why section 2 of the proposed initiative relates to an administrative rather than a legislative matter.
The sponsors respond in general by referring to our decision in Yute Air Alaska, Inc. v. McAlpine.[33] They contend that language in the superior court's decision, which we published as part of our opinion in Yute Air, indicates general disagreement with the approach taken by other jurisdictions concerning the legislative/administrative dichotomy. They note that the superior court in Yute Air observed that "[a]nalytically, laws may be enacted on any subject under the sun: They can command the tides to stand still for King Canute or the mountain to come to Mohammed."[34] The sponsors infer from the superior court's decision in Yute Air that this court "concluded that an initiative requiring the governor to seek repeal of a federal statute (the Jones Act) related to a legislative matter, and not an administrative matter, because the initiative proposed a new public policy."
The sponsors also argue that even apart from Yute Air the proposed initiative is legislative in character. They contend that the fact that the initiative proposes a new policy is determinative, even though complex technical issues may be implicated. They also contend that the proposal is not made administrative in character merely because it directs City officials to take necessary and specified steps to accomplish the new policy:
Initiative Sponsors do not seek to direct the City's conduct of a proceeding before the RCA. Instead, their initiatives establish a policy objective, the discontinuance of the City's current retail electric utility service. Decisions regarding the specifics of conducting the RCA proceeding are left entirely to City administrators. Just as a directive to the governor to seek the repeal of a federal statute was held to be a proper subject of the initiative in Yute Air, a directive to the City to take the steps necessary to discontinue electric utility service, including participating in necessary regulatory proceedings, is a proper subject for an initiative.
Although we agree in large part with the sponsors' ultimate position on the merits, we do not believe that Yute Air is a source of precedent on the issue of whether a proposed initiative is legislative or administrative in character. Two points indicate that Yute Air did not rely on the distinction between legislative and administrative initiatives, and so cannot give us guidance on how to differentiate between them.
First, the discussion in the superior court's decision set out in Yute Air suggests that the legislative/administrative dichotomy does not apply to initiatives at the state level. The superior court explained that "unlike state governments in which the three great powers are separated, local governing bodies are generally vested with an admixture of both legislative and administrative powers."[35] The superior court implied, then, that this difference in governmental structure makes the legislative/administrative dichotomy relevant at the municipal level but not at the state level. This, in turn, suggests that Yute Air should not be understood as applying the legislative/administrative distinction because at issue there was a statewide rather than a municipal initiative.
Second, the decision's analysis was directed toward a concern other than the legislative/administrative distinction. One of the two main questions we addressed in Yute Air was whether the state law initiative at issue *479 was a law or a resolution.[36] The other main issue was whether the initiative complied with the single-subject rule of the Alaska Constitution.[37] We interpret the superior court's decision to be addressing the law/resolution dichotomy, rather than the legislative/administrative dichotomy, in the paragraph that begins, "[a]nalytically, laws made be enacted on any subject under the sun."[38] For these reasons, we do not rely on Yute Air as precedent on the question of whether the proposed initiative in the present case is legislative or administrative in character.
Instead, we turn to the tests used by cases in other jurisdictions. We agree with the City that the guidelines in the Kansas Taxpayers opinion are useful, except for the fourth one. The fourth guideline states that unless a measure is "quite clearly and fully legislative and not principally executive or administrative," it is not an appropriate subject for an initiative.[39] In our view the "quite clearly and fully legislative" language of this guideline may give too much weight to the administrative aspects of an initiative containing both legislative and administrative matters. As such, this guideline could run counter to our rule of construction that proposed initiatives should be construed liberally, where reasonably possible, to support the electorate's right to participate in direct law-making.
Under the first guideline  is a new law being made or an existing law being executed[40]  the proposed initiative is legislative in character. Removing the City from the electrical utility business would be a new policy direction rather than a step along a previously charted course. Further, the permanency and generality aspects of the first guideline are also satisfied. The proposed initiative contemplates that the City will permanently be out of the electrical utility business. The generality requirement is satisfied because the proposed initiative is designed to take the City completely out of the electrical utility business rather than merely barring the City from serving a particular area within the utility's service district.
With respect to the second guideline the proposed initiative is also legislative in character. The second guideline provides:
Acts that declare public purpose and provide ways and means to accomplish that purpose generally may be classified as legislative. Acts that deal with a small segment of an overall policy question generally are administrative.[[41]]
The proposed initiative declares a public purpose, albeit a negative one. Further, it provides ways and means to accomplish its purpose by directing the City to take all necessary steps to discontinue electric power sales, including obtaining regulatory approval. Again, the proposed initiative does not merely deal with a small segment of the issue, but rather the overall policy question of whether the City should continue to act as an electrical utility.[42]
The third guideline, regarding the expertise necessary to make the relevant decision,[43] could, in the context of this case, be seen as conflicting with the second. It is easy to credit the City's argument that deciding to discontinue electrical utility service could be financially damaging to the City in ways that the electorate cannot readily appreciate. *480 Further, there may be technical reasons underlying the City's refusal to buy wind-generated power.[44] Disagreement with this decision appears to be the motive underlying the proposed initiative. The City is also correct that directing it to engage in regulatory litigation is administrative both inherently and because expertise is required to intelligently assess whether such litigation is likely to be effective.
Nonetheless, we think that guideline three should not supersede guidelines one and two when analyzing broad policy decisions such as the decision here. In our view the Kansas Taxpayers case demonstrates the appropriate use of this guideline. There the proposed initiative sought the repeal of an ordinance that dictated that the city's storm sewers be operated as a storm water utility system.[45] The court found that the initiative was administrative in nature and therefore that it was properly outside the scope of the initiative process.[46] In reaching this conclusion, the court took pains to point out that the ordinance sought to be repealed was not the so-called "charter ordinance," which gave the city the authority to develop and maintain storm sewers, but rather was an ordinance adopted pursuant to the authority of the charter ordinance that included "specific provisions to establish, operate, and fund a storm water utility ... within the authority granted by [the][c]harter [o]rdinance."[47] Stressing that the city already owned and maintained the existing system, the court observed that "the operation, management, and financing" of the system fit within the context of the third guideline pertaining to specialized training and experience in municipal government.[48]
The Supreme Court of Montana also took this view of the third guideline in its decision in Town of Whitehall v. Preece.[49] There the question was whether an initiative that sought to repeal an ordinance requiring the metering of water was administrative rather than legislative in character.[50] Interpreting the third guideline, the court viewed the issue presented in Kansas Taxpayers as involving merely details concerning funding for the city-owned system.[51] The court stated:
As to the third guideline, the most effective means of operating and managing a city-wide water system reasonably fits within the context of decisions that require specialized knowledge and experience with respect to city management. In Kansas Taxpayers, which involved an ordinance concerning billing for a municipality's storm water utility system, the court stated:
The physical structure of the system, maintenance, and fee assessment and collection all fit within the purview of the City's expertise. The City already owns and maintains the existing system; [the challenged ordinance] also fits within a city's expertise in terms of fiscal management.[[52]]
Unlike in Kansas Taxpayers, the proposed initiative in the present case deals not with the details concerning the form and funding of a City service but with the policy decision of whether the City should get out of the business of providing the service. The proposal to terminate all services falls most clearly within the first two guidelines: it is a new law and a declaration of a public purpose, and it provides for ways to accomplish that purpose. It would be contrary to the premise of the initiative power to place the enactment of new laws and policies out of *481 bounds simply because such laws and policies present difficult and complex choices.[53] We therefore think that the third guideline must have a subordinate role to the first two when applied to broad policy decisions such as this one. We also believe that even though ways and means of accomplishing a new policy may be administrative in character, they should not disqualify an initiative that both provides for a new policy and provides ways and means to accomplish that purpose. The purpose of the administrative exclusion is to avoid crippling a previously enacted policy. That purpose is not called into play when a new policy and the ways and means of accomplishing it are integrated in a single initiative.
We therefore believe that the proposed initiative is legislative in character. We are aided in reaching this view by decisions that hold that the question of whether to provide utility services on an area-wide basis  or to purchase a private utility  is an appropriate subject for the initiative and referendum power.[54] These cases support our view that though the decision to purchase or provide a utility service may implicate administrative matters, that fact alone does not convert the new policy decision itself into an impermissible administrative one.[55] These cases are also important because they indicate that acquiring or establishing a utility is legislative in character and it is generally held that the reversal of a legislative decision must *482 also be regarded as legislative rather than administrative.[56]
By most recognized tests for distinguishing legislative from administrative proposals, the proposal here is legislative. It is permanent in nature rather than temporary. It declares a new policy and deals with the overall policy question rather than merely a small segment of a pre-established policy. Likewise, it establishes a new law rather than executing a law already in existence. For these reasons, we conclude that the proposed initiative relates to a legislative rather than an administrative enactment and does not violate AS 29.26.110(a)(3).
For these reasons the judgment of the superior court with respect to Application II is AFFIRMED.
NOTES
[1] According to the initiative sponsors, the City refuses to take advantage of wind generation facilities on St. Paul Island that would make clean, less-expensive electricity available to city residents. In response, the sponsors seek to remove the City from the utility business so that a company that will utilize wind-generated electricity can replace it.
[2] AS 29.26.110 provides:

(a) An initiative or referendum is proposed by filing an application with the municipal clerk containing the ordinance or resolution to be initiated or the ordinance or resolution to be referred and the name and address of a contact person and an alternate to whom all correspondence relating to the petition may be sent. An application shall be signed by at least 10 voters who will sponsor the petition. An additional sponsor may be added at any time before the petition is filed by submitting the name of the sponsor to the clerk. Within two weeks the clerk shall certify the application if the clerk finds that it is in proper form and, for an initiative petition, that the matter
(1) is not restricted by AS 29.26.100;
(2) includes only a single subject;
(3) relates to a legislative rather than to an administrative matter; and
(4) would be enforceable as a matter of law.
(b) A decision by the clerk on an application for petition is subject to judicial review.
[3] See Swetzof v. Philemonoff, 192 P.3d 992 (Alaska 2008).
[4] Swetzof, 192 P.3d at 992-93.
[5] Id. at 993.
[6] Id.
[7] We are now advised that Application II has been certified and will be on the ballot of the October 2009 municipal election unless otherwise ordered by this court.
[8] City of Fairbanks v. Fairbanks Convention & Visitors Bureau, 818 P.2d 1153, 1155 (Alaska 1991).
[9] Brooks v. Wright, 971 P.2d 1025, 1027 (Alaska 1999) ("When reviewing initiative challenges ... we narrowly interpret the subject matter limitations that the Alaska Constitution places on initiatives.").
[10] See Staudenmaier v. Municipality of Anchorage, 139 P.3d 1259, 1261 (Alaska 2006) ("[I]nitiatives touching upon the allocation of public revenues and assets require careful consideration." (quoting Pullen v. Ulmer, 923 P.2d 54, 58 (Alaska 1996) (internal quotation marks omitted)); Brooks, 971 P.2d at 1027 ("[W]e have a duty to give questions involving the propriety of an initiative's subject matter `careful consideration.'" (quoting Pullen, 923 P.2d at 58)).
[11] Brooks, 971 P.2d at 1027 (footnote omitted).
[12] See Swetzof v. Philemonoff, 192 P.3d 992, 993 (Alaska 2008).
[13] Id.
[14] Id.
[15] 71 P.3d 896, 900 n. 21 (Alaska 2003).
[16] 698 P.2d 1173 (Alaska 1985).
[17] See id. at 1175.
[18] See id. at 1177.
[19] Id. at 1175.
[20] Alaska Const. art. XI, § 1 ("The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum.").
[21] Yute Air, 698 P.2d at 1176.
[22] 514 P.2d 233, 235 n. 13 (Alaska 1973).
[23] See ch. 74, §§ 1-20, SLA 1985.
[24] See id. § 9.
[25] Housing Auth. of Eureka v. Superior Court, 35 Cal.2d 550, 219 P.2d 457, 461 (1950).
[26] Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections & Ethics, 441 A.2d 871, 875 (D.C. 1980).
[27] 6 SANDRA M. STEVENSON, ANTIEAU ON LOCAL GOVERNMENT LAW § 89.06, at 89-10, 89-11 (2d ed.2008).
[28] Id. at 89-11 (quoting City of Newport v. Gugel, 342 S.W.2d 517, 519 (Ky.1960)).
[29] 5 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 16:54 at 407-11 (3d ed.2004).
[30] 255 Kan. 534, 874 P.2d 667 (1994).
[31] Id. at 671-72 (citing City of Lawrence v. McArdle, 214 Kan. 862, 522 P.2d 420 (1974) (internal citations and quotation marks omitted)).
[32] See Town of Whitehall v. Preece, 288 Mont. 55, 956 P.2d 743, 749-51 (1998); Johnson v. City of Alamogordo, 121 N.M. 232, 910 P.2d 308, 312-13 (1996).
[33] 698 P.2d 1173 (Alaska 1985).
[34] Id. at 1176.
[35] Id.
[36] Id. at 1182.
[37] Id. at 1180.
[38] Id. at 1176.
[39] City of Wichita v. Kansas Taxpayers Network, Inc., 255 Kan. 534, 874 P.2d 667, 672 (1994).
[40] Id. at 671-72.
[41] Id. at 672.
[42] Cf., e.g., Keigley v. Bench, 90 Utah 569, 63 P.2d 262, 263, 265 (1936) (holding a resolution to issue bonds "for the purpose of acquiring or constructing" an electric utility system was legislative and therefore subject to referendum because, in part, the "accomplishment of that end was a matter of public policy of vital importance"); State ex rel. Boynton v. Charles, 136 Kan. 875, 18 P.2d 149, 150 (1933) (holding that a referendum to repeal an enacted ordinance authorizing the city to build and equip a municipal gas plant and directing the city to instead buy gas under contract from a private party was legislative because the question was a matter of vital public interest and policy and of a "general and permanent character").
[43] Kansas Taxpayers, 874 P.2d at 672.
[44] The record is silent on what wind-generation facilities are available to the City, who owns them, what the cost of purchasing electricity from the facilities would be, what equipment would be required to ensure that adequate electricity would be available at all times, and what the costs of this equipment would be.
[45] Kansas Taxpayers, 874 P.2d at 669.
[46] Id. at 672-73.
[47] Id. at 672.
[48] Id.
[49] 288 Mont. 55, 956 P.2d 743, 750 (1998).
[50] Id. at 745, 749.
[51] Id. at 750.
[52] Id. (quoting Kansas Taxpayers, 874 P.2d at 672).
[53] See Alaska Const. art. I, § 2 ("All political power is inherent in the people. All government originates with the people, is founded upon their will only, and is instituted solely for the good of the people as a whole."); Alaska Const. art. XI, § 7 (enumerating exceptions to the power of initiative but not including difficulty of subject matter as such an exception); see also Tumpson v. Farina, 240 N.J.Super. 346, 573 A.2d 472, 474 (App.Div.1990) (holding an ordinance adopted to implement a redevelopment project on the city's waterfront was legislative and subject to referendum, and stating that though the "project is a `complex matter' which demanded `careful study' and `thorough investigation,' ... we find no evidence that the legislature intended to bar referenda for such reasons").
[54] See, e.g., Scott v. City of Orlando, 173 So.2d 501, 505 (Fla.Dist.App. 1965) (quoting McQUILLIN approvingly in noting that "acquisition or construction of a public utility" has generally been "deemed [a] proper [proposition] for initiative or referendum"); State ex rel. Didelius v. City Comm'n of Sandusky, 131 Ohio St. 356, 2 N.E.2d 862, 865 (1936) (holding an initial ordinance authorizing the acquisition or construction of a public utility and providing for the method of financing the project was subject to referendum but subsequent ordinances "incidental to and in furtherance of such project" would not be subject to referendum); Low v. City of Monticello, 54 P.3d 1153, 1161 (Utah 2002) (holding the question of whether the city council should exercise the option reserved to it by ordinance to repurchase the electrical power distribution system was legislative and subject to referendum because "the decision to purchase or acquire a power system ... is a purely legislative decision" that did not become administrative simply because pursued via exercise of previously negotiated contractual right); Keigley v. Bench, 90 Utah 569, 63 P.2d 262, 265 (1936) (holding a resolution regarding financing the purchase of an electric utility system was legislative and subject to referendum because, in part, it "was calculated to bind [the city] to contract for or purchase an electric lighting and power system and to operate [it]"); 5 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 16:56 at 421 (3d ed.2004); cf. Whitehead v. H & C Dev. Corp., 204 Va. 144, 129 S.E.2d 691, 696 (1963) ("While the establishment of the city-owned water system may have been in pursuance of a broad public policy and, therefore, a legislative matter, the receipts and expenses incidental to its maintenance and management are executive or administrative matters."). Other cases hold that the decision of whether or not a city should offer to renew a utility franchise is legislative because such a decision involves legislative discretion. See Lindelli v. Town of San Anselmo, 111 Cal. App.4th 1099, 4 Cal.Rptr.3d 453, 466 (2003) (holding a city's decision to award a waste management franchise to a new provider was subject to referendum and stating, "[t]he issuance of a franchise involves the setting, not the implementation, of public policy ... `[t]he rule is firmly established that the granting of a franchise by a city or county is a legislative act'") (citations omitted)); Vanmeter v. City of Paris, 273 S.W.2d 49, 50 (Ky. 1954) (distinguishing an earlier Kentucky case wherein the opposite result was reached because in that case a statute mandated the city offer a franchise for sale, leaving no legislative discretion in the legislative body).
[55] See Low, 54 P.3d at 1161 ("When the decision to purchase is made, the city council enacts a law authorizing city officials to take the administrative action necessary to realize the purchase."); cf. State ex rel. Wilkinson v. Edwards, 305 Mo. 431, 266 S.W. 127, 128-30 (1924) (concluding an ordinance locating a right of way for construction of a road and directing the city "to institute all necessary legal proceedings for the acquisition" of the land was "legislative in character" and therefore its repeal was subject to referendum).
[56] See Wilkinson, 266 S.W. at 130 ("[A] legislative act cannot be repealed ... by an administrative order. Such [an] act can only be repealed by a later legislative act.").