*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MUNICIPALITY OF ANCHORAGE, | ) | |
| | ) | Supreme Court No. S-15315 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-06812 CI |
| v. | ) | |
| | ) | O P I N I O N |
| SAM ANDREW HOLLEMAN and | ) | |
| JASON ALWARD, | ) | No. 6883 - March 28, 2014 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances:  Michael R. Gatti and Mary B. Pinkel, Wohlforth, Brecht, Cartledge & Brooking, Anchorage, and Theresa L. Hillhouse, Assistant Municipal Attorney, and Dennis A. Wheeler, Municipal Attorney, Anchorage, for Appellant.  Susan Orlansky, Feldman Orlansky & Sanders, Anchorage, for Appellees.

Before:  Winfree, Stowers, Maassen, and Bolger, Justices, and Matthews, Senior Justice.[*]   [Fabe, Chief Justice, not participating.]

MAASSEN, Justice.

---

[*]     Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

## I.    INTRODUCTION

The Anchorage Assembly passed an ordinance modifying the labor relations chapter of the Anchorage Municipal Code.  Two citizen-sponsors filed an application for a referendum that would repeal the ordinance.  The Municipality rejected the application, reasoning that the proposed referendum addressed administrative matters that were not proper subjects for direct citizen legislation.  The sponsors filed suit in superior court and prevailed on summary judgment.  The Municipality appealed, arguing that the referendum is barred because (1) state and municipal law grants exclusive authority over labor relations to the Assembly; (2) the referendum makes an appropriation; and (3) its subject is administrative, not legislative.  Following oral argument, we issued an order on January 10, 2014, affirming the superior court's grant of summary judgment to the sponsors.  This opinion explains our reasoning.

## II.    FACTS AND PROCEEDINGS

### A.    The Ordinance

On February 12, 2013, Mayor Dan Sullivan and two members of the Anchorage Assembly proposed Anchorage Ordinance No. 2013-37, "An Ordinance Amending Anchorage Municipal Code Chapter 3.70, Employee Relations, with Comprehensive Updates Securing Long Term Viability and Financial Stability of Employee and Labor Relations."  The Assembly approved the final version of the ordinance six weeks later, and the ordinance took effect immediately.[1]

The ordinance amends the Employee Relations chapter of the Anchorage Municipal Code (AMC).[2]  It first adds six new subsections to the Declaration of Policy

---

[1]    Anchorage Ordinance (AO) 2013-37(S-2) § 6 (2013).

[2]    AMC 3.70 (2013).

in AMC 3.70.020.[3] These subsections encourage the development and implementation of a managed competition program,[4] cap salary and benefit increases, standardize employee benefits and holidays, limit enhanced pay programs, and require unions to reimburse the Municipality for employee time spent performing services for the union.

The ordinance also limits overtime compensation; prohibits strikes; eliminates binding arbitration for police, fire protection, and emergency medical services; bars arbitrators from relying on past practices to alter unambiguous provisions in collective bargaining agreements; allows the Municipality to implement its "last best offer" if the parties are at a bargaining impasse; and expands the definitions of "confidential" and "supervisory" employees, thereby increasing the number of employees who are barred from collective bargaining.[5] The ordinance makes other relatively minor amendments throughout the Code for purposes of clarity and consistency.

B.    Proceedings Below

Sam Andrew Holleman and Jason Alward (the sponsors) filed an application with the municipal clerk's office for a referendum that would repeal the ordinance. The Municipality rejected the application on the advice of its attorney, who concluded that the referendum sought to address administrative rather than legislative

---

[3]    *Compare* AMC 3.70.020 (2013) *with* former AMC 3.70.020 (2012).

[4]    A "managed competition program" is defined in the ordinance as "a program intended to procure the delivery of the most reliable, efficient and effective municipal services to the citizens of Anchorage, through municipal sponsorship of regulated competition for the delivery of selected services."

[5]    *Compare* AMC 3.70.010 (2013) *with* former AMC 3.70.010 (2012).

matters and therefore violated subject-matter restrictions imposed by law.[6] The sponsors filed suit in superior court on May 2, 2013, seeking declaratory and injunctive relief. The Municipality, in its answer, sought a declaratory judgment in its favor.

The parties agreed that there were no material facts in dispute and filed cross-motions for summary judgment. The superior court heard oral argument on August 19, 2013, granted summary judgment to the sponsors in a written opinion, and ordered that the referendum application be accepted. The sponsors soon collected enough signatures to place the referendum on the ballot, and the ordinance was suspended pending an election.[7]

The Municipality filed this appeal.

## III. STANDARDS OF REVIEW

We review a grant of summary judgment de novo and will affirm "if there are no genuine issues of material fact" and "the moving party is entitled to judgment as a matter of law."[8] We review questions of law by "adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[9] We apply our independent

---

[6] This was the sponsors' second application. Their first was rejected for the same reasons, as well as for "technical defects" that they subsequently corrected.

[7] Article III, subsection 3.02(c) of the Anchorage Municipal Charter provides that the "filing of a referendum petition suspends the ordinance . . . if the petition is filed within 60 days after the effective date of the ordinance," and that the suspension terminates if the referendum is defeated by the voters.

[8] *Municipality of Anchorage v. Repasky*, 34 P.3d 302, 305 (Alaska 2001).

[9] *Carmony v. McKechnie*, 217 P.3d 818, 819 (Alaska 2009) (internal quotation marks omitted).

judgment when interpreting the Alaska Statutes, municipal charters, and municipal codes.[10]

## IV. DISCUSSION

### A. Legal Framework

Article XI, section 1 of the Alaska Constitution provides that "[t]he people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum." This right is extended by statute to citizens of home-rule local governments.[11] The Anchorage Municipal Charter accordingly "guarantees . . . [t]he right of initiative; the right of referendum; and the right to recall public officers, as herein provided."[12] The right of referendum is not absolute. Under article XI, section 7 of the Alaska Constitution, "[t]he referendum shall not be applied to dedications of revenue, to appropriations, to local or special legislation, or to laws necessary for the immediate preservation of the public peace, health, or safety," and a state statute requires that local government charters contain the same restrictions.[13] The Anchorage Charter explicitly prohibits direct legislation on "ordinances establishing budgets, fixing mill levies, authorizing the issuance of bonds, or appropriating funds."[14]

---

[10] *Repasky*, 34 P.3d at 305.

[11] AS 29.10.030(a) ("A home rule charter shall provide procedures for initiative and referendum.").

[12] Charter art. II(1).

[13] AS 29.10.030(c) ("A charter may not permit the initiative and referendum to be used for a purpose prohibited by art. XI, § 7 of the state constitution.").

[14] Charter art. III, § 3.02(a).

"[W]e liberally construe the constitutional and statutory provisions pertaining to the use of initiatives . . . so that the people are permitted to vote and express their will on the proposed legislation."[15]

**B.  The Referendum Is Not Preempted By State Or Municipal Law.**

In support of its position that the sponsors' referendum application was properly rejected, the Municipality first argues that the Public Employment Relations Act, the Anchorage Charter, and the Municipality's home-rule status give exclusive authority over labor relations to the Assembly, preempting the citizens' right to legislate in that area by initiative and referendum.  The Municipality argues alternatively that the referendum at issue here impermissibly strips the Assembly of its authority to enact labor relations ordinances.  We reject these arguments.

**1.  Public Employment Relations Act**

The Public Employment Relations Act[16] (PERA) establishes statewide guidelines for public employment relations, while allowing local governments to opt out of its provisions.[17]  According to the Municipality, PERA grants exclusive authority over employment relations to the Assembly, and the referendum at issue here clearly conflicts with that grant of exclusive authority.[18]  The Municipality relies specifically on

---

[15]  *Sitkans for Responsible Gov't v. City & Borough of Sitka*, 274 P.3d 486, 492 (Alaska 2012) (internal quotation marks omitted); *see also Thomas v. Bailey*, 595 P.2d 1, 3 (Alaska 1979) ("The right of initiative and referendum, sometimes referred to as direct legislation, should be liberally construed to permit exercise of that right.").

[16]  AS 23.40.070-.260.

[17]  AS 23.40.255(a).

[18]  We would invalidate a local initiative or referendum that conflicted with state law.  *See Whitson v. Anchorage*, 608 P.2d 759, 761 (Alaska 1980) (rejecting voter initiative to require voter approval for new taxes where statute required that taxes be
(continued...)

AS 23.40.255(a), which provides that PERA applies to political subdivisions of the state "unless the legislative body of the political subdivision, by ordinance or resolution, rejects having [PERA] apply." But the only authority this statute gives to "the legislative body of the political subdivision" is the authority to reject PERA, which the Assembly did shortly after PERA was enacted.[19] There is nothing in AS 23.40.255(a), or elsewhere in PERA, that requires or allows the legislative body to exercise *exclusive* control over labor relations once it has opted out of the Act.

The Municipality relies on several Washington cases that prohibited voter initiatives on grounds that the power at issue had been granted to the city's governing body; such a grant was interpreted to mean "exclusively the mayor and city council and not the electorate."[20] We do not need to decide whether to apply the same rule here. While PERA does grant the "legislative body" of the Municipality a specific power, it is only the power to reject PERA's provisions, not the exclusive power thereafter to legislate in the area of labor relations.[21]

---

[18](...continued)
levied only by general ordinance).

[19] *See Anchorage Mun. Emps. Ass'n v. Municipality of Anchorage*, 618 P.2d 575, 581 (Alaska 1980).

[20] *Mukilteo Citizens for Simple Gov't v. City of Mukilteo*, 272 P.3d 227, 233 (Wash. 2012) (holding that an initiative requiring a popular vote to authorize the use of automated traffic safety cameras for tickets was beyond the scope of the initiative power because the state legislature granted authority to the local legislature, not the city); *City of Sequim v. Malkasian*, 138 P.3d 943, 949-51 (Wash. 2006) (holding that an initiative was prohibited where the legislature "unambiguously granted the legislative body of the city the authority over revenue bonds").

[21] AS 23.40.255(a).

### 2. Anchorage Municipal Charter

The Municipality also contends that certain provisions of its Charter, read together, grant exclusive authority to the Assembly to regulate "all aspects of employee relations and personnel classification and procedures." Article V, § 5.06 of the Charter states that "[t]he assembly by ordinance shall adopt an administrative code providing for . . . [p]ersonnel policy and rules preserving the merit principle of employment." Article II(9) of the Charter "guarantees . . . to the people of Anchorage . . . [t]he right . . . to a comprehensive personnel classification and procedures system created by ordinance and based upon merit." But while these provisions require the Assembly to enact labor-relations ordinances, they do not purport to grant the Assembly *all* authority in that area, to the exclusion of direct citizen legislation through initiative and referendum.

When Anchorage voters approved the Charter, they knew that certain listed subjects — mill levies, the issuance of bonds, and appropriation of funds — were off-limits for direct citizen legislation because the Charter expressly said so.[22] Labor relations is not on the list. Particularly given the importance of the rights of initiative and referendum, we will not readily imply such a broad addition to the subjects that cannot be addressed through the exercise of those rights.[23]

### 3. Home-rule status

The Municipality argues that because the legislature has not limited the authority of home-rule municipalities to enact labor ordinances, the Assembly's authority in the area is exclusive. But this argument fails for the same reason as the Municipality's

---

[22]     Charter art. III, § 3.02(a).

[23]     *See Vanvelzor v. Vanvelzor*, 219 P.3d 184, 188 (Alaska 2009) ("We follow the doctrine of statutory construction that when the legislature expressly enumerates included terms, all others are impliedly excluded.").

arguments based on PERA and the Charter. That a legislative body has the authority to make laws does not mean that its authority to make laws is *exclusive* of the citizens' correlative right of direct legislation, absent some express limitation. If it were otherwise, the universe in which the initiative and referendum could be exercised would be a small one.

### 4. Divesting the Assembly of the authority to create labor ordinances

The Municipality also argues that the referendum, if passed, would "strip the Assembly of its power to create labor relations ordinances." The Municipality compares this ordinance to the initiative at issue in *Carmony v. McKechnie*, which proposed to take away the borough assembly's power to pass land-use regulations by subjecting any regulation to a popular vote.[24] The initiative was prohibited because it sought to bypass state statutes requiring that a borough establish a planning commission to "review, recommend, and administer measures" necessary to implement land use plans,[25] and because it would have divested both current and future legislatures "of [their] statutorily-mandated role in zoning and land use planning."[26]

In contrast, the referendum in this case does not subject any future labor ordinances passed by the Assembly to a popular vote; it merely allows a popular vote on a single ordinance. Nor does the referendum prevent the Assembly from passing labor ordinances in the future. As the sponsors point out, "[a]ccepting the Municipality's claim that the referendum would result in an impermissible divestiture of the Assembly's

---

[24] 217 P.3d 818, 819 (Alaska 2009).

[25] *Id*. at 821 (citing *Griswold v. City of Homer*, 186 P.3d 558, 561-62 (Alaska 2008)).

[26] *Id*.

legislative power effectively would preclude *all* referenda on local ordinances, because all such referenda are by nature a way for the voters to reject one act of the local legislature." Our holding in *Carmony* does not invalidate the referendum at issue here.

## C. The Referendum Does Not Apply To An Appropriation.

Article XI, section 7 of the Alaska Constitution prohibits application of the referendum to "dedications of revenue" or "to appropriations," and subsection 3.02(a) of the Anchorage Municipal Charter correspondingly prohibits use of the referendum for "establishing budgets" or "appropriating funds." The Municipality argues that the referendum at issue here appropriates public assets because the ordinance it seeks to repeal was itself intended to save money on labor costs; repealing the ordinance, the argument goes, will *ipso facto* cost money that the Assembly could otherwise direct toward other priorities.

But we have never held that any effect on public resources triggers the prohibition on direct legislation; nearly all legislation involves public assets to some degree.[27] We have held that "[a]n initiative proposes to make an appropriation if it would set aside a certain specified amount of money or property for a specific purpose or object in such a manner that is executable, mandatory, and reasonably definite with no further legislative action."[28] In *Anchorage Citizens for Taxi Reform v. Municipality of*

---

[27] *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1077 (Alaska 2009) ("[T]he prohibition against initiatives that appropriate public assets does not extend to prohibit initiatives that regulate public assets, so long as the regulations do not result in the allocation of an asset entirely to one group at the expense of another.").

[28] *Alliance of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, 273 P.3d 1128, 1136 (Alaska 2012) (quoting *Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 993 (Alaska 2004) and *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, 818 P.2d 1153, 1157 (Alaska 1991)) (internal quotation (continued...)

*Anchorage*, we noted our use of "a two-part inquiry to determine whether a particular initiative makes an appropriation."[29]  Under this test, we first "determine whether the initiative deals with a public asset"; our prior cases hold that "public revenue, land, a municipally-owned utility, and wild salmon are all public assets that cannot be appropriated by initiative."[30]  The second step in the analysis is to "determine whether the initiative would appropriate that asset."[31]  In making this determination we look to " 'the two core objectives' of the limitation on the use of the initiative power to make appropriations":  first, "preventing 'give-away programs' that appeal to the self-interest of voters and endanger the state treasury"; and second, "preserving legislative discretion by 'ensur[ing] that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs.' "[32]

The parties agree that the referendum at issue here deals with public revenue, which is a public asset for purposes of this analysis.  As to whether the

---

[28](...continued)
marks omitted).

[29]	151 P.3d 418, 422 (Alaska 2006).  We have never had occasion to decide whether a proposed referendum will make or repeal an appropriation, but we have addressed the issue a number of times in the context of initiatives, and we see no reason why the analysis would differ.  In one referendum case, *Washington's Army v. City of Seward*, 181 P.3d 1102, 1105-06 (Alaska 2008), we expressly declined to reach the issue of whether a city's decision to vacate a public street in favor of a planned inter-agency administrative and visitor center was an appropriation, holding that the referendum application had been properly rejected for other reasons.

[30]	*Anchorage Citizens for Taxi Reform*, 151 P.3d at 422-23 (footnotes omitted).

[31]	*Id.* at 423.

[32]	*Id.* (emphasis in original).

referendum would appropriate that asset, the Municipality does not argue that it is a "give-away program"; it contends rather that the referendum interferes with the Assembly's control over the allocation of limited municipal resources by preventing the Municipality from implementing cost-saving measures — measures that would, in turn, free up public revenues to be spent "in other areas of city government, such as public works, public health, and non-union employee wages."

But the referendum does not compel or restrict the expenditure of public funds, the approval of labor contracts, or any particular level of employee compensation. In a Summary of Economic Effects that accompanied the proposed ordinance when it was presented to the Assembly, the Municipality's Departments of Law and Employee Relations explained the ordinance's anticipated impact on public funds:

> By itself, this ordinance does not raise revenue or reduce expenses, although the intent, in part, is to better manage labor costs over time. Until specific labor agreements are negotiated and approved by the Assembly, the economic effects of this ordinance cannot be known. Overall, the economic effects will require a comparison of a given current contract to the proposed new contract. Even the "soft" cap on wage increases may not create economic effects different from the current contract, depending on changes in CPI and other factors. In addition, every contract is subject to the annual budgeting and appropriations process.

> There may be reductions in administrative costs related to managing fewer benefit plans, pay codes, and managing fewer contract clauses across all the contracts. But, these cost reductions are not predictable at this time.

Under the Municipality's own assessment, the economic effects of the ordinance are indirect and presently unknowable; there is no reason to believe that the economic effects of the referendum repealing the ordinance are any different. This is not at all the

"executable, mandatory, and reasonably definite" set-aside that our case law requires before we will find that an initiative or referendum makes an appropriation.[33]

## D.    The Ordinance Is Legislative.

The common law in many jurisdictions restricts the powers of initiative and referendum to "enactments that are legislative rather than administrative or executive in character."[34]  We recognized this restriction in 1973.[35]  The legislature codified the restriction for municipalities in 1985, at least with regard to the initiative; we assume for purposes of argument that it applies to the referendum as well.[36]  The rationale for the rule is based on "government efficiency grounds" — giving citizens the right to demand a vote for "every administrative act of the city council would place municipal government in a straight-jacket and make it impossible for the city's officers to carry on the public business."[37]

Again, the government-efficiency rationale appears to apply equally to both referendums and initiatives.  In *Swetzoff v. Philemonoff*, we articulated three guidelines

---

[33]    *Alliance of Concerned Taxpayers*, 273 P.3d at 1136.

[34]    *Swetzof v. Philemonoff*, 203 P.3d 471, 476 (Alaska 2009).

[35]    *Wolf v. Alaska State Hous. Auth.*, 514 P.2d 233, 235 n.13 (Alaska 1973).

[36]    The legislature addressed the powers of initiative and referendum for both home-rule and general law municipalities through 1985 amendments to the Municipal Code.  AS 29.26.110(a) now requires a municipal clerk to certify, "for an initiative petition, that the matter . . . relates to a legislative rather than to an administrative matter."  The statute contains no such requirement for referendum petitions.  We do not need to decide here, however, whether the restriction to legislative matters applies to referendums, as we hold that the referendum at issue is legislative and would not be barred in any event.

[37]    *Swetzof*, 203 P.3d at 476 (quoting *Hous. Auth. of Eureka v. Superior Court*, 219 P.2d 457, 461 (Cal. 1950)).

for determining whether an initiative impermissibly addresses an administrative matter, and we apply the same guidelines in this case:

> 1. An ordinance that makes new law is legislative; while an ordinance that executes an existing law is administrative. Permanency and generality are key features of a legislative ordinance.
>
> 2. Acts that declare public purpose and provide ways and means to accomplish that purpose generally may be classified as legislative. Acts that deal with a small segment of an overall policy question generally are administrative.
>
> 3. Decisions which require specialized training and experience in municipal government and intimate knowledge of the fiscal and other affairs of a city in order to make a rational choice may properly be characterized as administrative, even though they may also be said to involve the establishment of a policy.[38]

We first address whether the ordinance at issue makes new law. The Municipality acknowledges that certain provisions of the ordinance at issue here were not in previous versions of the Municipal Code and instead represent new policies. It argues that the policies are good ones, but it fails to adequately explain why they are not new law.[39] It contends that the ordinance represents simply "a step along a previously

---

[38] *Id*. at 477, 479 (quoting *City of Wichita v. Kansas Taxpayers Network, Inc.*, 874 P.2d 667, 671-72 (Kan. 1994)).

[39] For example, the Municipality argues that the new cap on salary and benefit increases will allow the Municipality to "not . . . exceed the cost of living with [its] overall [labor cost] increases," and the uniform holiday provisions "will make it easier for supervisors to manage their employees." Similarly, the Municipality claims that the no-strike provision "recognizes the threat to [the] public, health, and safety that would result if other unions were to strike."

charted course"[40] because it returns the Municipality to policies that were in effect in the 1980s and that resulted in fairly standardized employee benefits. As the sponsors point out, however, the Municipality followed a different course for several decades. A return to the policies of 1985 represents a "new policy direction"[41] for 2013. We conclude that the ordinance makes new law.

The ordinance is also permanent and general. The Municipality claims that the ordinance is not permanent because it does not take the Municipality "permanently . . . out of the practice of recognizing its unions and collectively bargaining with them," and because a future Assembly could again change the Municipal Code. But this argument is unpersuasive. If permanency in this context meant that a law had to be impervious to change by a successor legislative body, no law would ever be permanent under *Swetzof*.[42] The ordinance is also general; it applies to all public unions and union members.

The second guideline from *Swetzof* similarly points to the conclusion that the ordinance, and therefore the referendum seeking to repeal it, are legislative. The ordinance declares new public policies and provides ways and means to accomplish them. The Municipality broadly defines the relevant policy as "labor relations" or "collective bargaining" and argues that the ordinance deals with only a small piece of this larger question. The sponsors argue, on the other hand, that this distinction is "more

---

[40]    *Swetzof*, 203 P.3d at 479.

[41]    *Id.*

[42]    *See Mount Juneau Enters., Inc. v. City & Borough of Juneau*, 923 P.2d 768, 776 (Alaska 1996) ("The law is clear that a legislative body may not limit its power to act one way or another in the future in governmental[,] as opposed to proprietary, functions." (quoting *City of Louisville v. Fiscal Court of Jefferson Cnty.*, 623 S.W.2d 219, 224 (Ky. 1981))).

semantic than meaningful," and we agree. Even assuming that the relevant policy is the broad one of labor relations, the ordinance still deals with a significant part of this policy.

The ordinance also provides the "ways and means to accomplish [its] purpose."[43] The overall purpose of the ordinance is to "upgrade" the Municipality's labor code so that it is more uniform and efficient. The ordinance provides the ways and means to accomplish that purpose by setting out the six new policies designed to reduce costs, standardize benefits, and otherwise modernize the code,[44] and by making other revisions intended to effectuate these policy goals, such as eliminating the rights to strike and to binding arbitration.

The third *Swetzof* guideline looks to whether deciding the issue in question requires expertise.[45] If specialized training in municipal government or intimate knowledge of the fiscal affairs of the city is required to intelligently decide the issue, the ordinance is likely administrative rather than legislative.[46] However, "guideline three should not supersede guidelines one and two when analyzing broad policy decisions."[47] Thus in *Swetzof* we assumed that the proposed initiative (intended to move the City of St. Paul out of the business of selling electric power) could involve financial consequences "that the electorate cannot readily appreciate," but we nonetheless

---

[43]     *Swetzof*, 203 P.3d at 479.

[44]     The six new policies are: managed competition, limiting direct labor cost increases, standardizing employee benefits, reimbursement to the Municipality for union work, uniform holidays, and elimination of pay enhancements for new employees. AMC 3.70.020(C)-(H).

[45]     *Swetzof*, 203 P.3d at 479.

[46]     *Id.* at 479-80.

[47]     *Id.* at 480.

concluded that the initiative was legislative.[48]  Looking at the ordinance in this case, we credit the Municipality's arguments that it deals with many specific labor rules and the intricate details of the Municipality's interactions with unions and union members.  Still, the ordinance addresses broad concepts that voters can readily understand — managed competition, caps on compensation, bringing uniformity to benefits and holidays, and eliminating the rights to strike and to binding arbitration.  Again, we conclude that the third *Swetzof* factor points to a conclusion that the ordinance, and the referendum seeking to repeal it, are legislative.

Our conclusion is not changed by the fact that certain *parts* of the ordinance are clearly administrative.  In *Swetzof*, we specifically rejected a fourth guideline that would have only allowed direct legislation for "measures which are quite clearly and fully legislative and not principally executive or administrative."[49]  In rejecting this guideline, we observed that it "may give too much weight to the administrative aspects of an initiative containing both legislative and administrative matters," which would "run counter to our rule of construction that proposed initiatives should be construed liberally . . . to support the electorate's right to participate in direct law-making."[50]  Having reviewed the ordinance at issue here using the three guidelines of *Swetzof*, we conclude that the voters have a right to address it by referendum.

V.    **CONCLUSION**

The superior court's order granting summary judgment to the sponsors and denying the Municipality's cross-motion for summary judgment is AFFIRMED.

---

[48]    *Id.* at 479-81.

[49]    *Id.* at 477.

[50]    *Id.* at 479.