Thomas G. STAUDENMAIER, Appellant,

v.

**MUNICIPALITY OF ANCHORAGE and Barbara Gruenstein, Clerk, Appellee.**

No. S–11446.

Supreme Court of Alaska.

July 21, 2006.

---

Joseph D. O'Connell, Assistant Municipal Attorney, and Frederick H. Boness, Municipal Attorney, Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

In this case we must determine whether two initiative petitions submitted by Thomas Staudenmaier were properly rejected as improper appropriations in violation of article XI, section 7 of the Alaska Constitution. The initiatives called for the sale of city-owned utilities, and the Anchorage municipal clerk rejected the petitions on the grounds that they violated article XI, section 7's prohibition against initiatives that make appropriations. The superior court affirmed that decision. Staudenmaier argues first that the initiatives are not appropriations and second that, even if the initiatives are appropriations, they must be allowed because the municipal charter provision authorizing those initiatives is not governed by statutes applying article XI, section 7 to municipal governments. We reject both arguments and affirm the judgment of the superior court.

## II. FACTS AND PROCEEDINGS

The facts of this case are undisputed. Staudenmaier submitted five initiative petitions to the Anchorage municipal clerk, Barbara Gruenstein, in June 2003. The municipal clerk refused to certify two petitions dealing with the sale of city assets.[1] The first rejected initiative instructed the municipality to "sell and dispose of the total current and accrued assets of the Anchorage Municipal Light & Power Utility, Inc. at fair market value," and directed that the sale of the utility's "assets, generation facilities, headquarters buildings, power lines, equipment field crews and total accrued liabilities" be completed within one year of certification of the election. The initiative also granted

Kenneth P. Jacobus, Anchorage, for Appellant.

1. Another petition was rejected for vagueness. That petition is not at issue in this case.

Chugach Electric Association, Inc. a right of first refusal to purchase the municipal electric utility. In 2003 the municipality's electric utility had $356 million in assets; it averaged $85.6 million in yearly revenue during 1998–2003. The second initiative called for the sale of the Anchorage Municipal Refuse Collection Utility to the highest bidder. In 2003 the refuse utility had a "book value" of roughly $2.6 million; it averaged $5.6 million in yearly revenue during 1998–2003. The clerk refused to certify the petitions on the grounds that each "initiative cannot be certified as legally sufficient in that allocating public assets constitutes an appropriation which may not be enacted by initiative or repealed by referendum."

Staudenmaier appealed the rejection to the superior court, and both parties moved for summary judgment. Staudenmaier offered two arguments: (1) the initiatives were not appropriations; (2) the initiatives were authorized by section 16.02 of the Anchorage Municipal Charter, which states that "[t]his section permits the sale of a utility to be started by initiative. A valid initiative will go directly to a vote on the question of sale...." Superior Court Judge Dan A. Hensley affirmed rejection of the initiatives. Judge Hensley held that the initiatives constituted appropriations because they directed that municipal assets be used for a specified purpose, required that income-producing assets be converted into cash, and overrode the municipal assembly's decision to provide public utility services. He also held that because the statutory prohibition against appropriation by initiative applied to home rule municipalities, a charter provision allowing such initiatives was invalid. Staudenmaier appeals.

## III. STANDARD OF REVIEW

■ We review a grant of summary judgment *de novo*.[2] The interpretation of the constitutional term "appropriation" is a question of law to which we apply our independent judgment.[3] In exercising our independent judgment, we "adopt[ ] the rule of law most persuasive in light of precedent, reason, and policy." [4]

■ Regarding initiatives, "the usual rule is 'to construe voter initiatives broadly so as to preserve them whenever possible. However, initiatives touching upon the allocation of public revenues and assets require careful consideration because the right of direct legislation is limited by the Alaska Constitution.' " [5]

## IV. DISCUSSION

Staudenmaier renews before us the two arguments rejected by the superior court, maintaining that: (1) the initiatives do not make appropriations; and (2) the statutory prohibition against appropriation by initiatives did not apply to the Municipality of Anchorage when it enacted section 16.02 of the Anchorage Municipal Charter, which specifically allows for the sale of municipal utilities by voter initiative.[6] Because we conclude that the initiatives are appropriations and that the municipality was statutorily bound by the prohibition against appropriative initiatives, we affirm the superior court in all respects.

### A. The Proposed Initiatives Violate Article XI, Section 7 Because They Would Make Appropriations.

■ Article XI, section 7 of the Alaska Constitution prohibits the making of appropriations by voter initiative.[7] We have noted

2. *Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 991 (Alaska 2004).

3. *Id.*

4. *Id.* (quoting *Pullen v. Ulmer*, 923 P.2d 54, 58 (Alaska 1996)).

5. *Pullen*, 923 P.2d at 58 (quoting *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, 818 P.2d 1153, 1155 (Alaska 1991)).

6. Section 16.02 states in relevant part:

The municipality may sell, lease, or otherwise dispose of a municipal utility only pursuant to an ordinance or initiative proposition approved by three-fifths of the qualified voters voting on the question.

7. Article XI, § 7 of the Alaska Constitution provides:

The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define the jurisdiction of courts or prescribe their rules, or enact local or special

that this provision is designed to serve "two parallel purposes."[8] First, it works to prevent the passage of popular programs that would give away state resources to members of the public because such measures could lead to rash, unwise spending that would threaten the state fisc.[9] Second, we have also held that article XI, section 7 was designed to further the goal of "ensur[ing] that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs."[10] Initiatives implicate this rationale when they "would set aside a certain specified amount of money or property for a specific purpose or object in a manner that is executable, mandatory and reasonably definite with no further legislative action."[11]

In *Alaska Conservative Political Action Committee v. Municipality of Anchorage (ACPAC)*,[12] we relied on the first rationale to invalidate an initiative that directed the Municipality of Anchorage to sell its electric utility for a dollar to the same private enterprise that would have the right of first refusal under the initiative in this case, Chugach Electric Association, Inc. The present case differs from *ACPAC*, however, since the initiatives at issue here direct the assembly to sell the electric utility and the refuse collection utility for market price rather than for a dollar. Therefore, the present initiatives cannot be said to propose an impermissible "give-away," as was the case in *ACPAC*.[13]

However, in *McAlpine v. University of Alaska*,[14] we extended *ACPAC* and enunciated the second rationale: the term "appropriation" covers not only give-aways, but also allocations that deprive the legislature of its discretion to designate the use of public assets:[15]

> Outside the context of give-away programs, the more typical appropriation involves committing certain public assets to a particular purpose. To whatever extent it is desirable for the legislature to have sole responsibility for allocating the use of state money, it is also desirable for the legislature to have the same responsibility for allocating property other than money. Otherwise, the prohibition against appropriations by initiative could be circumvented by initiatives changing the function of assets the State already owns. We conclude that the constitutional prohibition against appropriations by initiative applies to appropriations of state assets, regardless of whether the initiative would enact a give-away program or simply designate the use of the assets.[16]

In *McAlpine* we concluded that an initiative section that required creation of a state community college system was unobjectionable because the section did not dictate the manner by which the state would have to comply.[17] However, we rejected another section of the same initiative in *McAlpine* because it specified the amount of state assets to be

---

legislation. The referendum shall not be applied to dedications of revenue, to appropriations, to local or special legislation, or to laws necessary for the immediate preservation of the public peace, health, or safety.

**8.** *City of Fairbanks,* 818 P.2d at 1156.

**9.** *Id.* (citing and discussing *Thomas v. Bailey,* 595 P.2d 1, 7 (Alaska 1979)); *see also Pullen,* 923 P.2d at 63 ("[T]he prohibition was meant to prevent an electoral majority from bestowing state assets on itself."). Under this rationale we have struck down initiatives that gave state land to members of the public, *Thomas,* 595 P.2d at 6–8; and that required the state to give sport, personal, and subsistence fishers priority over commercial fishers, *Pullen,* 923 P.2d at 61–64.

**10.** *City of Fairbanks,* 818 P.2d at 1156 (quoting *McAlpine v. Univ. of Alaska,* 762 P.2d 81, 88 (Alaska 1988)) (emphasis in original); *see also Pullen,* 923 P.2d at 63 ("The prohibition [against appropriative initiatives] was designed to pre-

serve to the legislature the power to make decisions concerning the allocation of state assets.").

**11.** *City of Fairbanks,* 818 P.2d at 1157 (holding that second rationale did not invalidate initiative repealing allocation of bed tax revenues to convention and visitors bureau, since returning control over revenues to city council expanded council's discretion over budgetary matters).

**12.** 745 P.2d 936 (Alaska 1987).

**13.** *Id.* at 938.

**14.** 762 P.2d 81 (Alaska 1988).

**15.** *Id.* at 88–89.

**16.** *Id.* at 89.

**17.** *Id.* at 91.

transferred to the community college system, allowing the state only the discretion to "designate the precise articles or parcels to be transferred." [18] Similarly, we recently rejected a municipal initiative that would have reserved a specific amount of land as a park because "the initiative's dedication requirement necessarily intrude[d] on the legislature's control over future designation." [19]

Staudenmaier offers an essentially circular argument as to why the initiatives in this case do not violate the prohibition against appropriative initiatives. He maintains that because section 16.02 of the Anchorage Municipal Charter specifically provides for the sale of municipally-owned utilities through voter initiative, the Anchorage Assembly's authority was always restrained by the possibility of such an initiative. But this argument only raises the question whether section 16.02 is constitutional given the prohibitions of article XI, section 7 of the Alaska Constitution, made applicable to municipalities by AS 29.26.100.

■ The Alaska Constitution's prohibition against appropriating public assets by initiative is meant to "re[tain] control ... of the appropriation process *in the legislative body*." [20] Generally speaking, an initiative is unobjectionable so long as it grants the legislature sufficient discretion in actually executing the initiative's purpose. [21] But where an initiative controls the use of public assets such that the voters essentially usurp the legislature's resource allocation role, it runs afoul of article XI, section 7. [22] Thus, the initiatives also run afoul of the constitution by requiring the sale of public assets. Accordingly, the Anchorage clerk did not err in rejecting the initiative petitions. [23]

## B. The Prohibition Against Appropriation by Initiative Applies to Home Rule Municipalities.

■ Article XI, section 7 has been applied by statute to initiatives affecting municipal governments. [24] Staudenmaier argues that even if these initiatives are appropriations, the initiatives must be allowed because the statutory provisions applying article XI, section 7 did not cover the Municipality of Anchorage at the time it enacted section 16.02 of its charter. This is so, he reasons, because the Municipality of Anchorage is merely a continuation of the prior City of Anchorage. We disagree.

In an effort to demonstrate that former AS 29.13.050 [25]—which Staudenmaier admits required that city charters comply with article XI, section 7—does not limit the municipality's charter, Staudenmaier relies on former AS 29.13.010. That statute allowed a home rule municipality to "amend its charter or adopt a new one." Staudenmaier maintains that former AS 29.13.050 did not apply to

**18.** *Id.*

**19.** *Alaska Action Ctr., Inc. v. Municipality of Anchorage,* 84 P.3d 989, 995 (Alaska 2004).

**20.** *City of Fairbanks v. Fairbanks Convention & Visitors Bureau,* 818 P.2d 1153, 1156 (Alaska 1991) (emphasis added).

**21.** *See McAlpine,* 762 P.2d at 91 (holding that initiative section creating community college system was not an appropriation because it left legislature with discretion to determine size and manner of relevant payments).

**22.** *See Alaska Action Ctr.,* 84 P.3d at 994–95.

**23.** Staudenmaier also argues that because the initiatives "involve[ ] a simple substitution of one municipal asset for another—a municipal utility for its fair market value in cash—no give-away program is involved." Because we conclude that the initiatives are impermissible in that they designate how the Anchorage Assembly is to make use of municipal assets, we need not decide whether the fact that the initiative exchanges public assets for fair market value affects whether the initiative is also an impermissible giveaway.

**24.** *See Alaska Action Ctr.,* 84 P.3d at 991 ("By statute, the power of lawmaking by initiative on the local level is reserved to the people of a home rule municipality. Also by statute, this power may not be used to take any of the actions listed in article XI, section 7 of the Alaska Constitution.") (citing AS 29.26.100 and AS 29.10.030(c)).

**25.** Former AS 29.13.050 stated in relevant part:

(a) Municipal charters shall provide the procedures for the initiative and referendum.
. . . .
(c) A charter may not permit the initiative and referendum to be used for a purpose prohibited by § 7, art. XI of the state constitution.

pre-existing home rule municipalities that adopted new charters.

Staudenmaier grounds his argument on the fact that former AS 29.13.050 was not listed in AS 29.13.100, which stated that "[o]nly the following provisions of this title apply to home rule municipalities as prohibitions on acting otherwise than as provided." Both former AS 29.13.050 and .100 were passed as part of the 1972 amendments to the municipal code,[26] and Staudenmaier reasons that the failure to list section .050 among the restrictions on home rule municipalities evinces the legislature's intention to apply former AS 29.13.050(c) only to general law municipalities. He also cites to legislative reports for the proposition that AS 29.13.050 did not apply to municipalities that already had home rule charters when the amendments took effect.[27] Thus, he asserts that home rule municipalities that existed before the 1972 amendments could enact new charter provisions that did not comply with article XI, section 7.

Staudenmaier applies similar reasoning to AS 29.26.100. This statute was passed as part of the 1985 amendments to the municipal code[28] and provides that "[t]he powers of initiative and referendum are reserved to the residents of municipalities, except the powers do not extend to matters restricted by art. XI, § 7 of the state constitution." Because the provision is not listed among the prohibitions on home rule municipalities,[29] Staudenmaier argues that it is only applicable to general law municipalities, and thus maintains that the 1985 amendments do not invalidate home rule charter provisions that do not

comply with article XI, section 7.[30] While he concedes that AS 29.10.030 does apply to home rule municipalities, he maintains that this provision is limited in scope; he argues that it only requires that future home rule charter sections comply with article XI, section 7, and that prior provisions, including section 16.02 of the Anchorage Municipal Charter, remain in effect.

However, we need not parse Staudenmaier's interpretation of the 1972 or the 1985 amendments because he has failed to establish a necessary component of his argument. Specifically, he maintains that the municipality was able to pass charter provisions that did not comply with former AS 29.13.050 (and thus article XI, section 7) because the municipality existed before the 1972 enactment of this statute. Staudenmaier argues that because the municipality can "relate back" to the City of Anchorage, which became a home rule municipality in 1959, the municipality predated the 1972 amendments. In response, the municipality argues that it did not exist before 1975, when the City of Anchorage merged with the Greater Borough of Anchorage and adopted the Anchorage Municipal Charter, and argues that it is improper to equate the City of Anchorage with the Municipality of Anchorage. The municipality's position is supported by *Municipality of Anchorage v. Frohne.*[31] In that case we noted that the municipality was not bound by the Greater Anchorage Area Borough's approval of an initiative because the municipality was "subsequently created" and "not yet in existence" when the borough approved the

**26.** Ch. 118, § 2, SLA 1972.

**27.** Specifically, Staudenmaier cites to a Supplemental Conference Report which states:

The code standardizes the procedure for adopting a charter in either a first class city or borough. The power of home rule municipalities to amend an existing charter or to adopt a new one is expressly recognized in this chapter (Sec.29.13.010), and, insofar as the provisions of Article 1, Charters are concerned, only the general requirements governing charter amendment (Sec.29.13.080) apply to municipalities having home rule charters when the code takes effect as law.

1972 House Journal 1718, 1720.

**28.** Ch. 74, § 9, SLA 1985.

**29.** Former AS 29.13.100 and current AS 29.10.200 both list restrictions on the conduct of home rule municipalities.

**30.** As the municipality notes, former AS 29.28.060 was identical to current AS 29.26.100 and was similarly not listed as a restriction on home rule government action. *See* former AS 26.13 .100. Although Staudenmaier does not refer to this statute, his argument suggests that this provision was also inapplicable to home rule municipalities.

**31.** 568 P.2d 3 (Alaska 1977).

petition.[32] The conclusion that the municipality did not exist prior to the merger of the borough and the City of Anchorage in 1975 defeats Staudenmaier's argument that the municipality predates the 1972 amendments.[33]

Moreover, the former AS 29.68.400 stated that "[u]pon ratification, the charter of a unified municipality ... operates to dissolve all local governments within the area of unification in accordance with the charter." Thus, the governing law at the time of the creation of the municipality also prevents Staudenmaier from relating the municipality back to its predecessor entities. The municipality emerged as a new legal entity upon the merger of the Greater Anchorage Area Borough and the City of Anchorage in 1975, and so even under Staudenmaier's reasoning, it was bound by former AS 29.13.050's requirement that initiative provisions not exceed the limits set out in article XI, section 7 of the state constitution. Accordingly, we reject Staudenmaier's argument that section 16.02 of the Anchorage Municipal Charter was validly enacted and conclude instead that it was void at its inception because it violated former AS 29.13.050(c) and article XI, section 7 of the Alaska Constitution.[34]

## V. CONCLUSION

The Anchorage municipal clerk acted correctly in rejecting the municipal utility initiative petitions because the initiatives would have been appropriations that would have allocated the municipality's resources, and would have eliminated the assembly's discretionary authority by requiring the sale of specific municipal assets. While Anchorage Municipal Charter section 16.02 ostensibly allows such initiatives, the provision was void at inception because it did not comply with Alaska Constitution, article XI, section 7's prohibition against appropriation by initiative. We therefore AFFIRM the judgment of the superior court.

MATTHEWS, Justice, concurring.

I agree with today's opinion. I write these additional words to dispel any possible conclusion that the court's broad interpretation of the term "appropriations" prohibits substantive lawmaking by initiative that properly should be within the initiative power. The proposals with which we are concerned seek to get the Municipality of Anchorage out of the electrical and garbage collection utility businesses. But they do so by requiring the Municipality to sell the tangible property that it uses in those businesses.

The anti-appropriations clause of article XI, section 7 of the Alaska Constitution does not prohibit the objective of these proposals, only their means. Thus, if the proposals were phrased to directly prohibit the Municipality from, after a certain date, selling or distributing electricity or offering garbage collection services, the anti-appropriations clause would not render the proposals illegiti-

---

**32.** *Id.* at 7–8.

**33.** Moreover, Staudenmaier offers no reason why the City of Anchorage, and not the borough, should be taken to be the municipality's predecessor for the purposes of the 1972 amendments. He focuses on the city because it was a home rule municipality, which supports his argument that the municipality was exempt from AS 09.13.050. But it is equally plausible that the borough is the proper predecessor entity, and its lack of a charter undercuts Staudenmaier's attempt to free the municipality from AS 09.13.050.

**34.** Staudenmaier's failure to prove a key part of his argument—that the city is the municipality's predecessor—makes it unnecessary for us to consider the validity of his interpretation of the relevant statutes. However, we note that his interpretation is unsupported by the legislative history. Staudenmaier admits that AS 29.10.030 applies to home rule municipalities, but he maintains that its predecessor, former AS 29.13.050, had a markedly different effect and did not apply to home rule municipalities. However, not only does the legislative record of the 1985 amendments fail to support this argument, it contains evidence to the contrary. Specifically, draft versions of AS 29.10.030 in the House and Senate changed the text from "municipal charter" to "home rule charter," but legislative analyses stated that this change had no substantive effect. *See* 1985–86 SENATE FINANCE COMM., SECTIONAL ANALYSIS OF PROPOSED HB 72, at 9 (on file with the Legislative Reference Library, Juneau, microfiche No. 2317) ("No substantive change"); 1985–86 HOUSE COMMUNITY & REG'L AFFAIRS COMM., SECTIONAL ANALYSIS OF PROPOSED HB 72, at 10 (on file with the Legislative Reference Library, Juneau, microfiche No. 3214.10) (new language caused "[n]o change").

mate. The lesson of today's opinion is that laws effecting substantial changes in policy can be made by initiative, but when they create surplus property, the disposition of such property is a matter for the representative lawmaking body.