*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RICHARD HUGHES, THE ALASKA MINERS ASSOCIATION, and THE COUNCIL OF ALASKA PRODUCERS, | ) ) ) ) ) | Supreme Court No. S-15468 |
| | ) | Superior Court No. 4FA-13-01296 CI |
| Appellants, | ) ) | O P I N I O N |
| v. | ) ) | No. 6981 – January 30, 2015 |
| MEAD TREADWELL, LIEUTENANT GOVERNOR OF THE STATE OF ALASKA, THE STATE OF ALASKA, DIVISION OF ELECTIONS, CHRISTINA SALMON, MARK NIVER, and JOHN H. HOLMAN, | ) ) ) ) ) ) ) ) | |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: Matthew Singer and Robert J. Misulich, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellants. Elizabeth M. Bakalar, Assistant Attorney General, and Michael C. Geraghty, Attorney General, Juneau, for Appellees Lieutenant Governor Mead Treadwell and the State of Alaska, Division of Elections. Timothy A. McKeever and Scott M. Kendall, Holmes Weddle & Barcott, P.C., Anchorage, for Appellees Christina Salmon, Mark Niver, and John H. Holman.

Before: Winfree, Stowers, Maassen, and Bolger, Justices.
[Fabe, Chief Justice, not participating.]

STOWERS, Justice.

## I.    INTRODUCTION

Richard Hughes, the Alaska Miners Association, and the Council of Alaska Producers (collectively referred to as "Hughes") challenged Lieutenant Governor Mead Treadwell's certification of a ballot initiative that would require final legislative approval for any large-scale metallic sulfide mining operation located within the Bristol Bay watershed. Hughes argued that the initiative violates the constitutional prohibitions on appropriation and enacting local or special legislation by initiative. Following oral argument we issued an order affirming the superior court's summary judgment order in favor of the State and the initiative sponsors, and allowing preparation of ballots to proceed.[1] This opinion explains our reasoning.[2]

## II.    FACTS AND PROCEEDINGS

In October 2012 Lieutenant Governor Mead Treadwell received an application for an initiative entitled "Bristol Bay Forever"; the Division of Elections denominated the initiative "12BBAY." The stated purpose of the initiative was to enact law "providing for [the] protection of Bristol Bay wild salmon and waters within or flowing into the existing 1972 Bristol Bay Fisheries Reserve." Section 1 of the initiative would add the following new section to AS 38.05:

---

[1]    *Hughes v. Treadwell*, 328 P.3d 1037 (Alaska 2014).

[2]    The initiative was passed by a majority of the voters in the November 4, 2014 general election.

**Sec. 38.05.142. Legislative approval required for certain large scale mines.**

(a) In addition to permits and authorizations otherwise required by law, a final authorization must be obtained from the legislature for a large-scale metallic sulfide mining operation located within the watershed of the Bristol Bay Fisheries Reserve designated in AS 38.05.140(f). This authorization shall take the form of a duly enacted law finding that the proposed large-scale metallic sulfide mining operation will not constitute danger to the fishery within the Bristol Bay Fisheries Reserve.

(b) The commissioner may adopt regulations under AS 44.62 to implement this section.

(c) In this section, "large-scale metallic sulfide mining operation" means a specific mining proposal to extract metals, including gold and copper, from sulfide-bearing rock that would directly disturb 640 or more acres of land.

Section 2 would amend the "uncodified law of the State of Alaska" to make findings recognizing the ecological and economic importance of the Bristol Bay Fisheries Reserve and the potential adverse effects of metallic sulfide mining.[3] After review by the Department of Law — which concluded that the initiative did not make an appropriation or enact local or special legislation and violated no other constitutional provisions — the Lieutenant Governor certified 12BBAY.

In January 2013 Hughes challenged 12BBAY's certification in superior court, arguing that the initiative "constitutes impermissible local and special legislation and violates the separation of powers doctrine." Hughes amended his complaint several times, joining the Alaska Miners Association and the Council of Alaska Producers as

---

[3]    Sections 3-5 of the initiative are not important to this appeal. Section 3 is a grandfather clause that would protect existing mining operations. Section 4 is a severability provision. Section 5 proposes an effective date.

plaintiffs. Initiative sponsors Christina Salmon, Mark Niver, and John H. Holman moved to intervene as defendants; the superior court granted their unopposed motion. In February the initiative sponsors moved for summary judgment. They then filed a separate answer to the amended complaint in March. In August Hughes cross-moved for summary judgment. In January 2014 Hughes filed a third amended complaint, adding a claim that 12BBAY would unconstitutionally appropriate state assets, and again moved for summary judgment.

Considering his motions for summary judgment together, Hughes argued that 12BBAY would: (1) enact local or special legislation in violation of article XI, section 7 of the Alaska Constitution; (2) violate separation of powers under article XII, section 11 of the Alaska Constitution; and (3) appropriate state assets in violation of article XI, section 7 of the Alaska Constitution. The superior court concluded that 12BBAY would not enact local or special legislation, would not clearly violate separation of powers, and would not appropriate public assets. The court granted summary judgment in favor of the State and the initiative sponsors and declined to enjoin placement of 12BBAY on the ballot. Hughes appeals to this court, challenging the superior court's conclusions that 12BBAY would not make an unconstitutional appropriation of public assets or enact local or special legislation.

## III. STANDARD OF REVIEW

We review a superior court's summary judgment decision de novo, reading the record in the light most favorable to, and drawing all reasonable inferences in favor of, the non-moving party.[4] Ballot initiatives are subject to pre-election review only "where the initiative is challenged on the basis that it does not comply with the state

---

[4] *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1072 (Alaska 2009) (citing *Anchorage Citizens for Taxi Reform v. Municipality of Anchorage*, 151 P.3d 418, 422 (Alaska 2006)).

constitutional and statutory provisions regulating initiatives" or "where the initiative is clearly unconstitutional or clearly unlawful."[5] The constitutionality of a ballot initiative is a question of law, which we review using our independent judgment, "adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[6] We "construe voter initiatives broadly so as to preserve them whenever possible."[7] And "we liberally construe constitutional and statutory provisions that apply to the initiative process."[8] However, whether an initiative complies with article XI, section 7's limits on the right of direct legislation requires careful consideration.[9]

## IV. DISCUSSION

Article XI, section 1 of the Alaska Constitution provides that "[t]he people may propose and enact laws by the initiative." But article XI, section 7 creates several specific restrictions on this power: "The initiative shall not be used to dedicate revenues, make or repeal appropriations, create courts, define jurisdiction of courts or prescribe

---

[5] *Alaskans for Efficient Gov't, Inc. v. State*, 153 P.3d 296, 298 (Alaska 2007) (quoting *State v. Trust the People*, 113 P.3d 613, 614 n.1 (Alaska 2005)).

[6] *Pebble Ltd. P'ship*, 215 P.3d at 1072 (citing *Anchorage Citizens for Taxi Reform*, 151 P.3d at 422).

[7] *Id.* at 1073 (quoting *Anchorage Citizens for Taxi Reform*, 151 P.3d at 422) (internal quotation marks omitted).

[8] *Kodiak Island Borough v. Mahoney*, 71 P.3d 896, 898 (Alaska 2003) (citing *Brooks v. Wright*, 971 P.2d 1025, 1027 (Alaska 1999); *Interior Taxpayers Ass'n v. Fairbanks North Star Borough*, 742 P.2d 781, 782 (Alaska 1987)).

[9] *Pebble Ltd. P'ship*, 215 P.3d at 1073 ("[I]nitiatives touching upon the allocation of public revenues and assets require careful consideration because the constitutional right of direct legislation is limited by the Alaska Constitution." (quoting *Anchorage Citizens for Taxi Reform*, 151 P.3d at 422) (internal quotation marks omitted)).

their rules, or enact local or special legislation." Here, Hughes argues that 12BBAY violates article XI, section 7's prohibition on appropriation by initiative and on enacting local or special legislation by initiative. We conclude that 12BBAY would not appropriate state assets or enact local or special legislation.

### A. 12BBAY Does Not Violate Article XI, Section 7's Anti-Appropriation Clause.

Hughes argues that 12BBAY violates the anti-appropriation clause of article XI, section 7 because it impermissibly interferes with the legislature's appropriation authority. Hughes contends that "12BBAY would set aside the entire Bristol Bay Watershed for the purpose of propagating salmon" and "would immediately ban new large-scale hardrock mining in this vast area without any further legislative action." The State and sponsors respond that 12BBAY is not an appropriation because it regulates rather than allocates resources, expressly leaving final authority to allocate state resources with the legislature.

We employ a two-part inquiry to determine whether an initiative makes an appropriation of state assets in violation of article XI, section 7.[10] First we must determine "whether the initiative deals with a public asset."[11] Second, if the initiative deals with a public asset, then we must determine "whether the initiative would appropriate that asset."[12] None of the parties dispute the superior court's conclusion that "12BBAY concerns a 'public asset.' " As the superior court noted, "[w]hether the initiative is construed as one that affects fish, waters of the state or state lands, each of

---

[10] *Id.* (citing *Anchorage Citizens for Taxi Reform*, 151 P.3d at 422).

[11] *Id.* (quoting *Anchorage Citizens for Taxi Reform*, 151 P.3d at 422) (internal quotation marks omitted).

[12] *Id.* (quoting *Anchorage Citizens for Taxi Reform*, 151 P.3d at 423) (internal quotation marks omitted).

these resources is a public asset."[13] The issue here is whether 12BBAY appropriates fish, waters of the state, or state lands.

In evaluating whether an initiative that deals with a state asset appropriates that asset, we look to "two core objectives" of the prohibition against appropriation by initiative.[14] Those objectives are (1) "to prevent give-away programs that appeal to the self-interest of voters and endanger the state treasury,"[15] and (2) "to preserve legislative discretion by ensur[ing] that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs."[16] Hughes does not challenge the superior court's conclusion that 12BBAY is not a give-away program. And that conclusion is clearly correct: 12BBAY does not give away state resources to voters or to any particular group, person, or entity.[17] Thus, the only remaining question is whether 12BBAY impermissibly interferes with the legislature's control over allocation of state assets.

---

[13]    *See id.* at 1073-74 (holding that "the waters of the state are a public asset," and noting that "[this court has] previously determined that public land, public revenue, a municipally-owned utility, and wild salmon are all public assets that cannot be appropriated by initiative" (footnotes omitted)).

[14]    *Id.* at 1074-75 (citing *Anchorage Citizens for Taxi Reform*, 151 P.3d at 423).

[15]    *Id.* (quoting *Anchorage Citizens for Taxi Reform*, 151 P.3d at 423).

[16]    *Id.* (emphasis in original) (quoting *McAlpine v. Univ. of Alaska*, 762 P.2d 88 (Alaska 1988)) (internal quotation marks omitted).

[17]    *See City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, 818 P.2d 1153, 1157 (Alaska 1991) (concluding that an initiative was not a give-away program because "[n]o particular group or person or entity [was] targeted to receive state money or property, nor [was] there any indication that by passing [the] initiative, the voters would be voting themselves money").

Hughes argues that because the legislature delegated the allocation of mineral leases to the Department of Natural Resources (DNR), 12BBAY impermissibly limits legislative discretion by forcing the legislature itself to make final allocation decisions and thus violates the anti-appropriation clause. The superior court concluded that 12BBAY does not limit legislative control over state assets because it expressly leaves final authority for appropriating state resources in the hands of the legislature. The superior court rejected Hughes's argument that the second objective of the anti-appropriation clause is violated when an initiative affects the process of making appropriations.

We have previously stated that an initiative "narrows the legislature's range of freedom to make allocation decisions in a manner sufficient to render the initiative an appropriation"[18] when "the initiative 'would set aside a certain specified amount of money or property for a specific purpose or object in such a manner that is executable, mandatory, and reasonably definite with no further legislative action.' "[19] Several of our decisions regarding whether particular initiatives would make an appropriation illuminate this principle.

In *McAlpine v. University of Alaska* we considered an initiative that would have established a state community college system and required the University of Alaska to transfer certain property to the new system.[20] We upheld the initiative's provisions creating and funding an independent community college system, but struck the

---

[18]     *Pebble Ltd. P'ship*, 215 P.3d at 1075 (citing *Pullen v. Ulmer*, 923 P.2d 54, 64 n.15 (Alaska 1996)).

[19]     *Id.* (quoting *Staudenmaier v. Municipality of Anchorage*, 139 P.3d 1259, 1262 (Alaska 2006)).

[20]     762 P.2d 81, 87-88 (Alaska 1988).

initiative's third sentence, which provided: "The amount of property transferred shall be commensurate with that occupied and operated by the Community Colleges on November 1, 1986."[21] We concluded that this language impermissibly "designat[ed] the use of an ascertainable and definite amount of state assets" — that amount in use by the community colleges on November 1, 1986.[22] We noted that a key consideration supporting this conclusion was that "no further legislative action would be necessary to require the University to transfer property to the community college system, or to specify the amount of property the University must transfer."[23] But we concluded that the initiative's second sentence, which provided that "[t]he University of Alaska shall transfer to the Community College System of Alaska such real and personal property as is necessary to the independent operation and maintenance of the Community College System,"[24] was not an appropriation because the legislature would maintain "all the discretion it needs with respect to appropriations for community colleges."[25] We reasoned that the legislature's discretion would be limited only to the extent that the legislature could not eliminate all appropriations for community colleges, and we saw no realistic danger that the legislature would attempt to do so.[26]

In *City of Fairbanks v. Fairbanks Convention & Visitors Bureau* we considered a local ballot initiative that would have amended a municipal ordinance

---

[21]     *Id.* at 83, 95-96.

[22]     *Id.* at 89-90.

[23]     *Id.* at 91.

[24]     *Id*. at 87.

[25]     *Id.* at 91.

[26]     *Id.*

governing the use of funds from the city's hotel tax by allowing revenue from the tax to be used for non-tourist and entertainment purposes and eliminating the requirement that a certain percentage of the tax go to the Fairbanks Convention and Visitors Bureau.[27] We concluded that the initiative did not repeal an appropriation because the ordinance it amended was not an "appropriation" as the legislature used the term in AS 29.35.100 — "that is as an act which accompanies the approval of the annual budget or is supplemental to that act."[28] We further concluded that the initiative was not an appropriation in its own right because it would not "reduce the [city] council's control over the appropriations process. Instead, the initiative [would] allow[] the council *greater* discretion in appropriating funds than [did] the current law."[29]

In *Pullen v. Ulmer* we considered an initiative that would direct allocation of the salmon harvest among competing users and would create preferences for subsistence, personal, and recreational users.[30] After determining that wild salmon were a state asset,[31] we held that the initiative would impermissibly appropriate that asset.[32] We concluded that the initiative was a giveaway, both because it was "designed to appeal to the self-interests of sport, personal and subsistence fishers" and would "significantly reduce[] the legislature's and Board of Fisheries' control of and discretion over allocation decisions, particularly in the event of stock-specific or region-specific

---

[27]   818 P.2d 1153, 1154-55 (Alaska 1991).

[28]   *Id.* at 1157.

[29]   *Id.* (emphasis added).

[30]   923 P.2d 54, 55 (Alaska 1996).

[31]   *Id.* at 61.

[32]   *Id.* at 63-64.

shortages of salmon between the competing needs of users."[33]  We distinguished *McAlpine* by emphasizing that the initiative at issue could significantly limit the Board of Fisheries' discretion to make allocation decisions in times of shortages and that "there is a very realistic danger that such shortages will occur."[34]

In *Alaska Action Center, Inc. v. Municipality of Anchorage* we considered an initiative that would have limited development on municipal property.[35]  We concluded that the initiative was distinguishable from the permissible section of the initiative in *McAlpine* because it " 'designat[ed] the use of' specified amounts of public assets in a way that encroaches on the legislative branch's exclusive 'control over the allocation of state assets among competing needs.' "[36]  We rejected Alaska Action Center's argument that the initiative was distinguishable from the one at issue in *McAlpine* because it did not mandate a transfer of property:  "*McAlpine* did not rest . . . on the fact that the initiative at issue there would have required a formal land transfer; the ruling focused on the fact that the initiative directed a specific amount of property to be used for a specified purpose."[37]  We also emphasized that the prohibition against appropriations is meant to keep "control of the appropriation process *in the*

---

[33]    *Id.* at 63.

[34]    *Compare id.* at 64 *with McAlpine v. Univ. of Alaska*, 762 P.2d 81, 91 (Alaska 1988) (upholding limitation on legislature's discretion to eliminate all funding for community colleges because there was "no realistic danger that the legislature would attempt to do so").

[35]    84 P.3d 989, 990-91 (Alaska 2004).

[36]    *Id.* at 994 (quoting *McAlpine*, 762 P.2d at 89; *Pullen*, 923 P.2d at 63) (footnote omitted).

[37]    *Id.*

*legislative body*"[38] and concluded that the initiative would intrude on legislative control by "limiting the mechanism for future change to another initiative process."[39]

In *Staudenmaier v. Municipality of Anchorage* we considered whether two initiatives that would have directed the municipality to sell utility assets would impermissibly appropriate assets.[40] The first initiative would have required the municipality to sell Anchorage Municipal Light & Power Utility and its assets and would have granted Chugach Electric Association a right of first refusal.[41] The second initiative would have required the municipality to sell the Anchorage Municipal Refuse Collection Utility to the highest bidder.[42] We concluded that the municipal clerk properly rejected the initiative petitions because, by requiring the sale of public assets, they violated article XI, section 7's prohibition on appropriating by initiative.[43] We explained that the line between an unobjectionable initiative that deals with a public asset and one that is an impermissible appropriation is crossed "where an initiative controls the use of public assets such that the voters essentially usurp the legislature's resource allocation role."[44]

---

[38]    *Id.* (emphasis in original) (quoting *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, 818 P.2d 1153, 1156 (Alaska 1991)) (internal quotation marks omitted).

[39]    *Id.* at 994-95.

[40]    139 P.3d 1259, 1260 (Alaska 2006).

[41]    *Id.* at 1260-61.

[42]    *Id.* at 1261.

[43]    *Id.* at 1263.

[44]    *Id.* (citing *Alaska Action Ctr. v. Municipality of Anchorage*, 84 P.3d 989, 994 (Alaska 2004)).

In *Pebble Ltd. Partnership ex rel. Pebble Mines Corp. v. Parnell* we considered an initiative that would have regulated large-scale metallic mines for the purpose of protecting water quality.[45] We concluded that the initiative dealt with a public asset — waters of the state — but that the initiative would not appropriate that asset.[46] As in this case, no party argued that the initiative was a "give-away program."[47] Instead, the primary question was "whether the initiative narrow[ed] the legislature's range of freedom to make allocation decisions in a manner sufficient to render the initiative an appropriation."[48] We concluded that because the initiative was properly read as "preclud[ing] only discharges of toxic chemicals and other mine waste that cause 'adverse effects' to humans, salmon, and waters used for human consumption or as salmon habitat," it did not make an appropriation.[49] We stated that "the prohibition against initiatives that appropriate public assets does not extend to prohibit initiatives that regulate public assets, so long as the regulations do not result in the allocation of an asset entirely to one group at the expense of another."[50] We further observed that the initiative left the Department of Environmental Conservation and Department of Natural

---

[45]     215 P.3d 1064, 1069-70 (Alaska 2009).

[46]     *Id.* at 1074-77.

[47]     *Id.* at 1075.

[48]     *Id.* (citing *Pullen v. Ulmer*, 923 P.2d 54, 64 n.15 (Alaska 1996)).

[49]     *Id.* at 1077.

[50]     *Id.*

Resources the discretion to determine specific amounts of toxic pollutants that may be discharged and did not exhibit any "explicit preference among potential users."[51]

In *Alliance of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough* we considered a ballot initiative passed by voters that required voter approval for all Borough capital projects with a total cost in excess of one million dollars.[52] We concluded that requiring voter approval for a specific class of Borough expenditures was an appropriation, and, therefore, the initiative was invalid.[53] We explained that "an initiative may make an impermissible appropriation not only when it designates public assets for some particular use, but also when it allocates those assets *away from* a particular group."[54] We concluded that the voters would not invariably approve all capital projects placed on the ballot as a result of the initiative, and thus the initiative would allocate assets away from those capital projects meeting the voter-approval threshold.[55]

Most recently in *Municipality of Anchorage v. Holleman* we considered, among other things, whether a referendum to repeal a municipal ordinance was an appropriation.[56] The ordinance at issue made a number of changes to the employee relations chapter of the Anchorage Municipal Code, including limiting overtime compensation, prohibiting strikes, and placing new restrictions on collective

---

[51]    *Id.*

[52]    273 P.3d 1128, 1130 (Alaska 2012).

[53]    *Id.* at 1137-38.

[54]    *Id.* at 1138 (emphasis added) (citing *Pullen v. Ulmer*, 923 P.2d 54, 64 (Alaska 1996)).

[55]    *Id.*

[56]    321 P.3d 378, 380 (Alaska 2014).

bargaining.[57] The municipality argued that by repealing an ordinance intended to save money on labor costs, the referendum would effectively appropriate public assets that the municipal assembly could direct to other priorities.[58] We rejected that argument, noting that "we have never held that any effect on public resources triggers the prohibition on direct legislation; nearly all legislation involves public assets to some degree."[59] We observed that "the referendum [did] not compel or restrict the expenditure of public funds, the approval of labor contracts, or any particular level of employee compensation," and that "the economic effects of the ordinance are indirect and presently unknowable."[60] Thus, we concluded that the referendum was not an " 'executable, mandatory, and reasonably definite' set-aside [of money or property] that our case law requires before we will find that an initiative or referendum makes an appropriation."[61]

Read together, these cases create a relatively detailed outline of when an initiative or referendum impermissibly limits legislative discretion to allocate state assets in violation of article XI, section 7. An initiative or referendum may: (1) mandate a non-appropriative allocation of property — including a transfer of property from a specific government entity — sufficient to accomplish a particular purpose;[62] (2) repeal a

_____

[57]    *Id.* at 380-81.

[58]    *Id.* at 384.

[59]    *Id.*

[60]    *Id.* at 385.

[61]    *Id.* (quoting *Alliance of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, 273 P.3d 1128, 1136 (Alaska 2012)).

[62]    *See McAlpine v. Univ. of Alaska*, 762 P.2d 81, 87, 96 (Alaska 1988) (approving initiative's requirement that the University of Alaska transfer to an independent community college system "such real and personal property as is necessary
(continued...)

-15-                                                    **6981**

legislative enactment that designates the use of government funds, as long as the statute or ordinance is not an "appropriation" as the legislature used the term in AS 29.35.100;[63] (3) increase the legislative body's discretion in making appropriations by changing existing law;[64] (4) regulate the use of public assets;[65] or (5) repeal a legislative enactment intended to reduce government expenditures in a particular area of the budget.[66]

But an initiative or referendum may not: (1) require the allocation of "an ascertainable and definite amount of state assets";[67] (2) set aside specified property for a particular use, especially where the initiative "limit[s] the mechanism for future change to another initiative process";[68] (3) set preferences among user groups of a particular

---

[62](...continued)
to the independent operation and maintenance of the Community College System").

[63]    *See City of Fairbanks v. Fairbanks Visitors & Convention Bureau*, 818 P.2d 1153, 1157 (Alaska 1991) (concluding that initiative amending a city ordinance that designated the use of the city's hotel tax did not repeal an appropriation).

[64]    *See id.* (concluding that initiative could not be an appropriation if it expanded the legislature's authority to allocate funds).

[65]    *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1077 (Alaska 2009) (concluding that an initiative precluding discharge of mining waste that causes " 'adverse effects' to humans, salmon, and waters used for human consumption or as salmon habitat" was not an appropriation).

[66]    *Holleman*, 321 P.3d at 381-85 (upholding referendum that would repeal municipal ordinance intended to reduce the Municipality of Anchorage's labor costs).

[67]    *See McAlpine*, 762 P.2d at 87-91 (striking from initiative a provision requiring the University of Alaska to transfer the amount of property "commensurate with that occupied and operated by the Community Colleges on November 1, 1986").

[68]    *See Alaska Action Ctr., v. Municipality of Anchorage*, 84 P.3d 989, 994-95 (Alaska 2004) (invalidating initiative limiting the use of a particular area of municipal
(continued...)

public resource;[69] (4) require the sale of specified public assets;[70] or (5) require voter approval for any public expenditure of funds within a particular class.[71]  Additionally, an initiative that regulates the use of public assets may not "result in the allocation of an asset entirely to one group at the expense of another."[72]  These cases also suggest that a limitation on legislative discretion is only an "appropriation" where the limitation would restrict a plausible legislative choice.[73]

The effect of 12BBAY is similar to that of the initiative at issue in *City of Fairbanks* in that it ultimately gives the legislature more discretion whether to approve a particular mining project.  In *City of Fairbanks* an existing ordinance allocated the use

---

[68](...continued)
land).

[69]    *See Pullen v. Ulmer*, 923 P.2d 54, 64 (Alaska 1996) (invalidating initiative establishing preferences for subsistence, personal, and recreational users in salmon fishery).

[70]    *See Staudenmaier v. Municipality of Anchorage*, 139 P.3d 1259, 1260-63 (Alaska 2006) (upholding municipality's rejection of initiative requiring the municipality to sell specified public utility assets).

[71]    *See Alliance of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, 273 P.3d 1128, 1137-38 (Alaska 2012) (invalidating initiative requiring voter approval for all Borough capital expenditures in excess of one million dollars).

[72]    *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1077 (Alaska 2009).

[73]    *See Pullen*, 923 P.2d at 64 (holding that initiative setting user preferences in salmon fishery was an appropriation because it would limit the Board of Fisheries' discretion to make allocation decisions in times of shortage and "there is a very realistic danger that such shortages will occur"); *McAlpine v. Univ. of Alaska*, 762 P.2d 81, 91 (Alaska 1988) (concluding that limiting legislature's discretion to eliminate all appropriations for community colleges was permissible because there was no realistic danger that the legislature would attempt to do so).

of hotel tax revenue and the initiative would have returned complete control of that revenue to the City Council.[74] In the present case an extensive set of statutes and regulations governs mining, and the legislature has delegated permitting decisions to DNR. 12BBAY would alter that scheme by returning final decision-making authority to the legislature for proposed "large-scale metallic sulfide mining operation[s] located within the watershed of the Bristol Bay Fisheries Reserve."

12BBAY is also distinguishable from each case where this court has invalidated an initiative on the basis that it interferes with the legislature's control over resource allocation. Unlike the initiative at issue in *McAlpine*, 12BBAY would not direct the use of "an ascertainable and definite amount of state assets."[75] While 12BBAY would regulate resource use in an identified geographic area, it does not set that area aside for a particular use as the initiative in *Alaska Action Center* would have.[76] 12BBAY does not require the sale of any public assets and does not require voter approval for any expenditure of public funds.[77] Finally, contrary to Hughes's assertion, 12BBAY does not attempt to allocate any state assets to one user group to the exclusion of another.[78] Adding an additional regulatory step for large-scale mining projects may or may not benefit the fishing industry and burden a segment of the mining industry, but

---

[74]    818 P.2d 1153, 1154-55 (Alaska 1991).

[75]    762 P.2d at 89.

[76]    84 P.3d 989, 995-96 (Alaska 2004).

[77]    *See Staudenmaier v. Municipality of Anchorage*, 139 P.3d 1259, 1263 (Alaska 2006); *Alliance of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, 273 P.3d 1128, 1137-38 (Alaska 2012).

[78]    *See Pullen*, 923 P.2d at 64 (invalidating initiative that would have established preferences for subsistence, personal, and recreational users in salmon fishery).

it certainly does not "result in the allocation of an asset entirely to one group at the expense of another."[79] And, ultimately, the legislature retains the discretion to make the necessary findings and decisions.

12BBAY undeniably would alter the legislature's existing scheme for allocating and regulating the use of the state's mineral resources. But this court concluded in *Pebble Limited Partnership* that there is no prohibition on initiatives altering existing public resource regulations.[80] An initiative violates the anti-appropriation clause of article XI, section 7 only when it "controls the use of public assets such that the voters essentially usurp the legislature's resource allocation role."[81] 12BBAY does not cross that line. Because the legislature would retain ultimate control over allocation of state assets, 12BBAY is not an appropriation.

B. **12BBAY Does Not Violate Article XI, Section 7's Local And Special Legislation Clause.**

Hughes argues that 12BBAY violates the local and special legislation clause of article XI, section 7 of the Alaska Constitution. He asserts that there is no legitimate basis for 12BBAY's narrow geographic scope. The State responds that 12BBAY is not unconstitutional under this court's interpretation of article XI, section 7's local and special legislation prohibition as articulated in *Pebble Limited Partnership*.

Both article XI, section 7 of the Alaska Constitution and AS 15.45.010 prohibit enacting local or special legislation by initiative. This prohibition is absolute. Article XI, section 7 provides that "[t]he initiative shall not be used to . . . enact local or

---

[79] *See Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1077 (Alaska 2009) (citing *Pullen*, 923 P.2d at 63-64).

[80] *Id.*

[81] *Staudenmaier*, 139 P.3d at 1263 (citing *Alaska Action Ctr.*, 84 P.3d at 994-95).

special legislation."[82] We apply a "two-stage analysis for determining whether proposed legislation is 'local or special legislation' barred by article XI, section 7."[83] We first consider "whether the proposed legislation is of general, statewide applicability."[84] If the initiative is generally applicable, the initiative will not enact local or special legislation and the inquiry ends.[85] If the initiative is not generally applicable, we move on to consider whether the initiative nevertheless "bears a fair and substantial relationship to legitimate purposes."[86] We have explained that this standard is analogous to our most deferential standard of equal protection review.[87]

The parties agree that 12BBAY is not generally applicable. We agree and therefore next consider whether 12BBAY "bears a fair and substantial relationship to

---

[82]    This contrasts with article II, section 19, under which a legislative act that is "local or special" may still be constitutional, so long as a general act could not have been made applicable. Hughes argues that 12BBAY is local or special legislation because the initiative could have been drafted to apply statewide. But neither article XI, section 7, nor any other source of authority in Alaska, suggests that an initiative would enact local or special legislation simply because it could have been drafted to apply statewide. Article II, section 19 implies that local or special legislation may be permissible where a general act could not have been made applicable, but that provision does not apply to initiatives. While the substantive provisions of these two constitutional provisions differ, the analysis they use to determine whether particular legislation is "local or special" is the same.

[83]    *Pebble Ltd. P'ship*, 215 P.3d at 1078.

[84]    *Id.* (citing *Boucher v. Engstrom*, 528 P.2d 456, 461 (Alaska 1974), *overruled on other grounds by McAlpine v. Univ. of Alaska*, 762 P.2d 81, 85 (Alaska 1988)).

[85]    *Id.*

[86]    *Id.* at 1079 (quoting *State v. Lewis*, 559 P.2d 630, 643 & n.44 (Alaska 1977)) (internal quotation marks omitted).

[87]    *Id.* (citing *Boucher*, 528 P.2d at 461).

legitimate purposes."[88] 12BBAY's purpose is to protect "Bristol Bay wild salmon and waters within or flowing into the existing 1972 Bristol Bay Fisheries Reserve." We conclude there is no serious question that requiring legislative approval of large-scale metallic sulfide mining operations in the Bristol Bay watershed bears a fair and substantial relationship to that purpose.[89] Thus, we must consider only whether protecting "Bristol Bay wild salmon and waters within or flowing into the existing 1972 Bristol Bay Fisheries Reserve" comprises a legitimate purpose. We conclude that it does.

The superior court determined that protecting the Bristol Bay fishery is legitimate because the legislation creating the Bristol Bay Fisheries Reserve had the same purpose and applied to the same geographic area as 12BBAY. The court stated that "[i]n effect . . . , [Hughes's] attack on 12BBAY as local and special legislation is really a misdirected attack on the creation of the fisheries reserve in 1972" and that "[t]here is nothing in Alaska constitutional jurisprudence that authorizes a collateral constitutional attack on an existing statute in the guise of a pre-election challenge to an initiative that does not seek to revise the existing statute."

Hughes argues that the superior court erred by concluding that AS 38.05.140(f) justified 12BBAY's special treatment of the Bristol Bay watershed. He suggests that the correct question is "whether the narrow classification drawn by the legislation that is actually at issue is fairly and substantially justified." As discussed above, the issue here is whether protecting the Bristol Bay fishery comprises a legitimate purpose, not whether it is "fairly and substantially justified." While we conclude that

---

[88]    *Id.* (internal quotation marks omitted).

[89]    The record indicates that large-scale metallic sulfide mining has real potential to affect water quality and fisheries.

AS 38.05.140 is relevant to whether 12BBAY's purpose is legitimate, we reject the superior court's conclusion that AS 38.05.140 is dispositive of that question. Under the court's reasoning, the purpose of any initiative that relies on the unchallenged classification or geographic scope of an existing and unchallenged statute with a similar purpose would be per se legitimate. Nothing in our jurisprudence supports such a rule.

Hughes argues there is no legitimate economic or biological basis for limiting 12BBAY to the Bristol Bay watershed. His argument suggests that the initiative's geographic scope must be justified by detailed economic or scientific findings. But such a requirement would not be consistent with our deferential "legitimate purpose" test. In *State v. Lewis* it was sufficient that legislation allowing a specific land transfer was "designed to facilitate statewide land use management and to resolve a host of pressing legal issues arising in the context of [the Alaska Native Claims Settlement Act]."[90] In *Baxley v. State* it was sufficient that the oil and gas leases singled out for modification had unique characteristics that could incentivize lessees to abandon the fields before extracting all of the oil, thus implicating the state's interest in maximizing oil production.[91]

As the superior court discussed in its decision in this case, the legislature recognized the importance of the Bristol Bay fishery by establishing the Bristol Bay Fisheries Reserve in AS 38.05.140(f). This statute mandates that oil and gas leases or exploration licenses may "not be issued on state owned or controlled land [within the reserve] until the legislature by appropriate resolution specifically finds that the entry

---

[90]     559 P.2d 630, 643-44 (Alaska 1977).

[91]     958 P.2d 422, 430-31 (Alaska 1998).

will not constitute danger to the fishery."[92] The record in this case also indisputably establishes that the Bristol Bay watershed has unique ecological, geographic, and economic characteristics; that the fishery has significant statewide importance; and that metallic sulfide mining poses potential water quality risks. For example, the initiative sponsors provided a report extensively documenting the economic importance of the Bristol Bay salmon industry, which concluded that Bristol Bay has the world's most valuable wild salmon fishery. The initiative sponsors also provided a report discussing the potentially significant impacts of a proposed large-scale mining project on the Bristol Bay wild salmon ecosystem.

Hughes's argument and the expert reports that he relies on paint a picture of the Bristol Bay fishery as comparatively less economically and biologically important than several other fisheries in the state. But even if this were correct, the Bristol Bay fishery does not need to be the most important or best fishery in the state to justify targeted legislation. Rather, it merely needs to have some unique statewide importance that justifies geographically limited legislation.[93] Even Hughes's economist, Dr. Michael Taylor, points to factors that distinguish Bristol Bay from the state's other salmon-producing regions and also show its significance to the state as a whole. For example, Bristol Bay possesses a particularly high incidence of sockeye salmon relative to other salmon species.[94] Its salmon enter the supply chain through different markets than other state fisheries — particularly Japan, China, and Russia — thus contributing to Alaska's

---

[92]    AS 38.05.140(f).

[93]    *See Baxley*, 958 P.2d at 430-31.

[94]    Bristol Bay also has the vast majority of sockeye (red) salmon statewide; chum and pink salmon represent the majority of the harvest in Prince William Sound and Southeast Alaska. A significant loss of salmon in Bristol Bay would therefore particularly affect the state's sockeye salmon population.

Asian-Russian export market. Bristol Bay has a significantly compressed harvest window,[95] with correspondingly low employment stability. Dr. Taylor states that "[c]ompared to other regions in Alaska, the Bristol Bay salmon fishery is an economic engine," even though much of the economic benefit favors non-residents. The total annual average (2008-2012) of gross earnings by salmon permit holders was approximately $143,000,000 for Bristol Bay, $94,000,000 for Southeast Alaska, and $93,000,000 for Prince William Sound. Excluding gross earnings by non-resident permit holders, the annual averages for these three regions were approximately $61,000,000 (Bristol Bay), $56,000,000 (Southeast Alaska), and $71,000,000 (Prince William Sound).

According to a report prepared by the University of Alaska Anchorage's Institute of Social and Economic Research titled "The Economic Importance of the Bristol Bay Salmon Industry," the Bristol Bay sockeye fishery "is the world's most valuable wild salmon fishery, and typically supplies almost half of the world's wild sockeye salmon." The report states that in 2010 "harvesting, processing, and retailing Bristol Bay salmon and the multiplier effects of these activities created $1.5 billion in output or sales value across the United States." "Between 2005 and 2010, Bristol Bay averaged 67% of total sockeye salmon harvests (by volume) . . . ." In 2010, Bristol Bay salmon fishing and processing employed an estimated 4,369 Alaska residents.

We conclude that Bristol Bay's unique and significant biological and economic characteristics are of great interest not just to the Bristol Bay region but to the

---

[95] The commercial fishing season is six to eight weeks in Bristol Bay, but most of the run occurs in just two weeks. This contrasts with fisheries in Prince William Sound and Southeast Alaska, where the harvest windows are longer by a month or more. Other fisheries that have higher incidence of coho or chum salmon may have several months more of harvest as well.

state as a whole.  We also conclude that 12BBAY's purpose — to protect "Bristol Bay wild salmon and waters" — is legitimate.  And we conclude that 12BBAY bears a fair and substantial relationship to the initiative's legitimate purpose.

The sponsors of 12BBAY certainly could have proposed an initiative of statewide application, but instead they chose to focus on a very important fishery in a single region.  As we explained in *Pebble Limited Partnership*, however, "legislatures routinely must draw lines and create classifications."[96]  As in the equal protection context, "we are guided by the familiar principles that a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."[97]  Applying these principles, we conclude that 12BBAY permissibly distinguishes the Bristol Bay watershed and its salmon fishery and does not violate the Alaska Constitution's prohibition on local or special legislation.

## V.    CONCLUSION

For the reasons discussed above, we AFFIRM the superior court's summary judgment order in favor of the State and the initiative sponsors.

---

[96]    *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1081 (Alaska 2009) (internal quotation marks omitted).

[97]    *Id.* (internal quotation marks omitted).